## QUINN *v.* UNITED STATES.

No. 8.   Argued April 4–5, 1955.—Decided May 23, 1955.

156

*David Scribner* and *Frank J. Donner* argued the cause for petitioner. With them on the brief were *Arthur Kinoy* and *Allan R. Rosenberg.*

*Robert W. Ginnane* argued the cause for the United States. With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Olney, Beatrice Rosenberg* and *John R. Wilkins.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

Petitioner was convicted of contempt of Congress under 2 U. S. C. § 192 in the District Court for the District of Columbia. Section 192 provides for the punishment of any witness before a congressional committee "who . . . refuses to answer any question pertinent to the question under inquiry . . . ." [1] On appeal, the Court of Appeals

---

[1] The section provides in full:

"Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any

for the District of Columbia Circuit reversed the conviction and remanded the case for a new trial.[2] Claiming that the Court of Appeals should have directed an acquittal, petitioner applied to this Court for certiorari. We granted the writ because of the fundamental and recurrent character of the questions presented.[3]

Pursuant to subpoena, petitioner appeared on August 10, 1949, before a subcommittee of the Committee on Un-American Activities of the House of Representatives. Petitioner was then a member and field representative of the United Electrical, Radio and Machine Workers of America. Also subpoenaed to appear on that day were Thomas J. Fitzpatrick and Frank Panzino, two officers of the same union. At the outset of the hearings, counsel for the committee announced that the purpose of the investigation was to inquire into "the question of Communist affiliation or association of certain members" of the union and "the advisability of tightening present security requirements in industrial plants working on certain Government contracts." [4] All three witnesses were asked questions concerning alleged membership in the Communist Party. All three declined to answer.

Fitzpatrick was the first to be called to testify. He based his refusal to answer on "the first and fifth amendments" as well as "the first amendment to the

joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

[2] 91 U. S. App. D. C. 344, 203 F. 2d 20.

[3] 347 U. S. 1008.

[4] Hearings before House Committee on Un-American Activities Regarding Communist Infiltration of Labor Unions, 81st Cong., 1st Sess., Part I, 541–542.

158

Constitution, supplemented by the fifth amendment." [5]
Immediately following Fitzpatrick's testimony, Panzino
was called to the stand. In response to the identical ques-
tions put to Fitzpatrick, Panzino specifically adopted as
his own the grounds relied upon by Fitzpatrick.[6] In addi-
tion, at one point in his testimony, Panzino stated that "I
think again, Mr. Chairman, under the fifth amendment,
that is my own personal belief." [7] On the following day,
petitioner, unaccompanied by counsel, was called to the
stand and was also asked whether he had ever been a
member of the Communist Party. Like Panzino before
him, he declined to answer, specifically adopting as his
own the grounds relied upon by Fitzpatrick.[8]

[5] *Id.*, at 602, 604.

[6] *Id.*, at 608.

[7] *Id.*, at 609.

[8] *Id.*, at 634–635:

"Mr. QUINN. I would like to make a statement along the lines
that Mr. Fitzpatrick made yesterday in regard to a question of that
nature. I feel that the political beliefs, opinions, and associations
of the American people can be held secret if they so desire.

"Mr. WOOD. And for those reasons do you decline to answer that
question?

"Mr. QUINN. I didn't say I was declining to answer the question.
Before I do answer the question I should like to say that I support
the position taken by Brother Fitzpatrick yesterday.

"Mr. WOOD. Did you hear his statement yesterday?

"Mr. QUINN. Yes; I did.

"Mr. WOOD. Do you support it in its entirety?

"Mr. QUINN. In its entirety.

"Mr. WOOD. Is there anything else you want to add to it?

"Mr. QUINN. No; I don't.

"Mr. WOOD. Will you accept it as the expression of your views,
then?

"Mr. QUINN. You may. I may add I feel I have no other choice
in this matter, because the defense of the Constitution, I hold sacred.
I don't feel I am hiding behind the Constitution, but in this case I am
standing before it, defending it, as small as I am.

"Mr. WOOD. Having made that statement and subscribed to the
sentiments expressed by the witness yesterday to whom you referred,

On November 20, 1950, all three witnesses were indicted under § 192 for their refusals to answer.[9] The three cases were tried before different judges, each sitting without a jury. Fitzpatrick and Panzino were acquitted. In Fitzpatrick's case, it was held that his references to "the first and fifth amendments" and "the first amendment to the Constitution, supplemented by the fifth amendment" constituted an adequate means of invoking the Self-Incrimination Clause of the Fifth Amendment.[10] Similarly, in Panzino's case, it was held that his reference to "the fifth amendment" was sufficient to plead the privilege.[11] In petitioner's case, however, the District Court held that a witness may not incorporate the position of another witness and rejected petitioner's defense based on the Self-Incrimination Clause.[12] Petitioner was accordingly convicted and sentenced to a term of six months in jail and a fine of $500.

---

will you now answer the question whether you are now or have ever been a member of the Communist Party?

"Mr. QUINN. I hold that the Constitution holds sacred the rights of people——

"Mr. WOOD. You have stated your position. Having enunciated your sentiments and your position, will you now answer the question whether you are now or ever have been a member of the Communist Party, or do you decline to answer?

"Mr. QUINN. I decline to discuss with the committee questions of that nature.

"Mr. WOOD. Proceed, Mr. Tavenner.

"Mr. TAVENNER. I believe in the light of that answer it is not necessary to ask you any further questions relating to those matters, so I will ask you this: Do you know Mr. James J. Matles?

"Mr. QUINN. Yes."

[9] Petitioner's motions to dismiss the indictment were denied *sub nom. United States* v. *Emspak,* 95 F. Supp. 1010, 1012 (D. D. C.).

[10] *United States* v. *Fitzpatrick,* 96 F. Supp. 491 (D. D. C.).

[11] *United States* v. *Panzino,* unreported, Criminal No. 1747–50 (D. D. C.).

[12] *United States* v. *Quinn,* unreported, Criminal No. 1744–50 (D. D. C.).

160

In reversing this conviction, the Court of Appeals, sitting *en banc,* held that "No formula or specific term or expression is required" in order to plead the privilege and that a witness may adopt as his own a plea made by a previous witness.[13]  Thus the Court of Appeals viewed the principal issue in the case as "whether Fitzpatrick did or did not claim the privilege."[14]  On this issue, a majority of the Court of Appeals expressed no view.  They agreed that a reversal without more would be in order if they "were of clear opinion that Fitzpatrick, and therefore Quinn, did claim the privilege."  But they were "not of that clear opinion."[15]  The Court of Appeals therefore ordered a new trial for determination of the issue by the District Court.[16]  The Court of Appeals also directed the District Court on retrial to determine whether petitioner "was aware of the intention of his inquirer that answers were required despite his objections."[17]  In that regard, however, it rejected petitioner's contention that a witness cannot be convicted under § 192 for a refusal to answer unless the committee overruled his objections and specifically directed him to answer.[18]

It is from that decision that this Court granted certiorari.

I.

There can be no doubt as to the power of Congress, by itself or through its committees, to investigate matters and conditions relating to contemplated legislation.  This power, deeply rooted in American and English institutions, is indeed co-extensive with the power to legislate.  Without the power to investigate—including of course the

[13] 91 U. S. App. D. C. 344, 347, 203 F. 2d 20, 23.
[14] *Id.,* at 347, 203 F. 2d, at 23.
[15] *Id.,* at 348, 203 F. 2d, at 24.
[16] *Ibid.*
[17] *Id.,* at 349, 203 F. 2d, at 25.
[18] *Ibid.*

authority to compel testimony, either through its own processes [19] or through judicial trial [20]—Congress could be seriously handicapped in its efforts to exercise its constitutional function wisely and effectively.[21]

But the power to investigate, broad as it may be, is also subject to recognized limitations. It cannot be used to inquire into private affairs unrelated to a valid legislative purpose.[22] Nor does it extend to an area in which Congress is forbidden to legislate.[23] Similarly, the power to investigate must not be confused with any of the powers of law enforcement; those powers are assigned under our Constitution to the Executive and the Judiciary.[24] Still further limitations on the power to investigate are found in the specific individual guarantees of the Bill of Rights, such as the Fifth Amendment's privilege against self-incrimination which is in issue here.[25]

The privilege against self-incrimination is a right that was hard-earned by our forefathers. The reasons for its inclusion in the Constitution—and the necessities for its preservation—are to be found in the lessons of history.[26] As early as 1650, remembrance of the horror of Star Chamber proceedings a decade before had firmly established the privilege in the common law of England. Transplanted to this country as part of our legal heritage, it soon made its way into various state constitutions and ultimately in 1791 into the federal Bill of Rights. The privilege, this Court has stated, "was generally regarded then, as now,

[19] Cf. *Anderson* v. *Dunn*, 6 Wheat. 204.

[20] *In re Chapman*, 166 U. S. 661.

[21] See *McGrain* v. *Daugherty*, 273 U. S. 135, 175.

[22] *Id.*, at 173–174; *Kilbourn* v. *Thompson*, 103 U. S. 168, 190.

[23] Compare *United States* v. *Rumely*, 345 U. S. 41, 46.

[24] *Kilbourn* v. *Thompson*, 103 U. S. 168, 192–193.

[25] The Amendment provides in pertinent part that "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

[26] See Griswold, The Fifth Amendment Today, 2–7.

162

as a privilege of great value, a protection to the innocent though a shelter to the guilty, and a safeguard against heedless, unfounded or tyrannical prosecutions." [27] Co-equally with our other constitutional guarantees, the Self-Incrimination Clause "must be accorded liberal construction in favor of the right it was intended to secure." [28] Such liberal construction is particularly warranted in a prosecution of a witness for a refusal to answer, since the respect normally accorded the privilege is then buttressed by the presumption of innocence accorded a defendant in a criminal trial. To apply the privilege narrowly or begrudgingly—to treat it as an historical relic, at most merely to be tolerated—is to ignore its development and purpose.

In the instant case petitioner was convicted for refusing to answer the committee's question as to his alleged membership in the Communist Party. Clearly an answer to the question might have tended to incriminate him.[29] As a consequence, petitioner was entitled to claim the privilege. The principal issue here is whether or not he did.

It is agreed by all that a claim of the privilege does not require any special combination of words.[30] Plainly a witness need not have the skill of a lawyer to invoke the protection of the Self-Incrimination Clause. If an ob-

[27] *Twining* v. *New Jersey*, 211 U. S. 78, 91. See also *Boyd* v. *United States*, 116 U. S. 616, 631–632.

[28] *Hoffman* v. *United States*, 341 U. S. 479, 486. Cf. *Counselman* v. *Hitchcock*, 142 U. S. 547, 562.

[29] *Blau* v. *United States*, 340 U. S. 159, specifically holding that such a question is protected by the privilege; *Brunner* v. *United States*, 343 U. S. 918, reversing 190 F. 2d 167 (C. A. 9th Cir.). See also *Hoffman* v. *United States*, 341 U. S. 479.

[30] Compare *Smith* v. *United States*, 337 U. S. 137, where the Court characterized a witness' statement "I want to claim privilege as to anything that I say" (p. 142) as a "definite claim of general privilege against self-incrimination" (p. 151).

jection to a question is made in any language that a committee may reasonably be expected to understand as an attempt to invoke the privilege, it must be respected both by the committee and by a court in a prosecution under § 192.

Here petitioner, by adopting the grounds relied upon by Fitzpatrick, based his refusal to answer on "the first and fifth amendments" and "the first amendment to the Constitution, supplemented by the fifth amendment." The Government concedes—as we think it must—that a witness may invoke the privilege by stating "I refuse to testify on the ground of the Fifth Amendment." Surely, in popular parlance and even in legal literature, the term "Fifth Amendment" in the context of our time is commonly regarded as being synonymous with the privilege against self-incrimination. The Government argues, however, that the references to the Fifth Amendment in the instant case were inadequate to invoke the privilege because Fitzpatrick's statements are more reasonably understood as invoking rights under the First Amendment. We find the Government's argument untenable. The mere fact that Fitzpatrick and petitioner also relied on the First Amendment does not preclude their reliance on the Fifth Amendment as well.[31] If a witness urges two constitutional objections to a committee's line of questioning, he is not bound at his peril to choose between them. By pressing both objections, he does not lose a privilege which would have been valid if he had only relied on one.

The Government, moreover, apparently concedes that petitioner *intended* to invoke the privilege. In its brief the Government points out "the probability that petitioner's ambiguous references to the Fifth Amend-

---

[31] As to the close relationship between the First Amendment and the privilege against self-incrimination, see Griswold, *supra*, note 26, at 8–9.

ment . . . were phrased deliberately in such vague terms so as to enable petitioner . . . to obtain the benefit of the privilege without incurring the popular opprobrium which often attaches to its exercise." [32]   But the fact that a witness expresses his intention in vague terms is immaterial so long as the claim is sufficiently definite to apprise the committee of his intention. As everyone agrees, no ritualistic formula is necessary in order to invoke the privilege. In the instant case, Quinn's references to the Fifth Amendment were clearly sufficient to put the committee on notice of an apparent claim of the privilege. It then became incumbent on the committee either to accept the claim or to ask petitioner whether he was in fact invoking the privilege. Particularly is this so if it is true, as the Government contends, that petitioner feared the stigma that might result from a forthright claim of his constitutional right to refuse to testify. It is precisely at such times—when the privilege is under attack by those who wrongly conceive of it as merely a shield for the guilty—that governmental bodies must be most scrupulous in protecting its exercise.

This ruling by no means leaves a congressional committee defenseless at the hands of a scheming witness intent on deception. When a witness declines to answer a question because of constitutional objections and the language used is not free from doubt, the way is always open for the committee to inquire into the nature of the claim before making a ruling. If the witness unequivocally and intelligently waives any objection based on the Self-Incrimination Clause, or if the witness refuses a committee request to state whether he relies on the Self-Incrimination Clause, he cannot later invoke its protec-

---

[32] Brief for United States, p. 33. The Government makes the same contention as to the petitioner in No. 9, *Emspak* v. *United States, post,* p. 190.

tion in a prosecution for contempt for refusing to answer that question. Here the committee made no attempt to have petitioner particularize his objection. Under these circumstances, we must hold that petitioner's references to the Fifth Amendment were sufficient to invoke the privilege and that the court below erred in failing to direct a judgment of acquittal.

## II.

There is yet a second ground for our decision.

Section 192, like the ordinary federal criminal statute, requires a criminal intent—in this instance, a deliberate, intentional refusal to answer.[33] This element of the offense, like any other, must be proved beyond a reasonable doubt. Petitioner contends that such proof was not, and cannot be, made in this case.

Clearly not every refusal to answer a question propounded by a congressional committee subjects a witness to prosecution under § 192. Thus if he raises an objection to a certain question—for example, lack of pertinency or the privilege against self-incrimination—the committee may sustain the objection and abandon the question, even though the objection might actually be without merit. In such an instance, the witness' refusal to answer is not contumacious, for there is lacking the requisite criminal intent. Or the committee may disallow the objection and thus give the witness the choice of answering or not. Given such a choice, the witness may recede from his position and answer the question. And if he does not then answer, it may fairly be said that the foundation has been laid for a finding of criminal

---

[33] *Sinclair* v. *United States,* 279 U. S. 263, 299. See also *In re Chapman,* 166 U. S. 661, 672, in which the Court, while upholding the constitutionality of the statute, recognized deliberateness as an element of the offense.

intent to violate § 192. In short, unless the witness is clearly apprised that the committee demands his answer notwithstanding his objections, there can be no conviction under § 192 for refusal to answer that question.[34]

Was petitioner so apprised here? At no time did the committee specifically overrule his objection based on the Fifth Amendment; nor did the committee indicate its overruling of the objection by specifically directing petitioner to answer. In the absence of such committee action, petitioner was never confronted with a clear-cut choice between compliance and noncompliance, between answering the question and risking prosecution for contempt. At best he was left to guess whether or not the committee had accepted his objection.

This ambiguity in the committee's position is apparent from the transcript of the hearing.[35] Immediately after petitioner stated that he was adopting Fitzpatrick's objection, the committee chairman asked petitioner: ". . . will you now answer the question whether you are now or ever have been a member of the Communist Party, or do you decline to answer?" In response to this, petitioner stated for the first time that he would not answer.

---

[34] See *United States* v. *Kamp*, 102 F. Supp. 757, 759 (D. D. C.): "Committees of Congress must conduct examinations in such a manner that it is clear to the witness that the Committee recognizes him as being in default, and anything short of a clear cut default on the part of the witness will not sustain a conviction for contempt of Congress. The transcript of the defendant Kamp's testimony fails to disclose such a clear cut default. The witness is not required to enter into a guessing game when called upon to appear before a committee. The burden is upon the presiding member to make clear the directions of the committee, to consider any reasonable explanations given by the witness, and then to rule on the witness' response." The defendant was accordingly acquitted.

On similar grounds, an acquittal was directed in *United States* v. *Browder*, unreported, Criminal No. 1784–50 (D. D. C.).

[35] See note 8, *supra.*

He said: "I decline to discuss with the committee questions of that nature." Committee counsel thereupon stated that further questioning "relating to those matters" was "not necessary" and proceeded upon a new line of inquiry. There is nothing in this colloquy from which petitioner could have determined with a reasonable degree of certainty that the committee demanded his answer despite his objection. Rather, the colloquy is wholly consistent with the hypothesis that the committee had in fact acquiesced in his objection.

Our view that a clear disposition of the witness' objection is a prerequisite to prosecution for contempt is supported by long-standing tradition here and in other English-speaking nations.[36] In this country the tradition

---

[36] While of course not binding on Congress or its committees, the practice in the States and other English-speaking jurisdictions is at least worthy of note.

For examples relating to recalcitrant witnesses before state legislative committees, see *Ex parte McCarthy,* 29 Cal. 395, 398; *People* v. *Keeler,* 99 N. Y. 463, 471, 2 N. E. 615, 617; *Lowe* v. *Summers,* 69 Mo. App. 637, 645.

Recalcitrant witnesses before investigating committees of the British House of Commons have traditionally been apprised of the disposition of their objections and given subsequent opportunity to respond before being subjected to the contempt power of the legislature. The practice has been as follows: The committee reports the failure to answer to the House. The witness is questioned about the cause of the refusal to answer before the Bar of the House. The House then votes on the validity of the objection. If the claim is rejected, the witness is specifically directed to answer. Only after a subsequent refusal is punishment imposed. See 88 *Journals of the House of Commons* 212, 218 (Case of Elizabeth Robinson before Select Committee on Liverpool Bribery, 1833); 90 *Journals of the House of Commons* 501, 504, and 29 *Hans. Deb.,* 3d Ser., 1249, 1279–1288 (Case of William Prentice before Select Committee on Great Yarmouth Bribery, 1835); 90 *Journals of the House of Commons,* 564, 571, 575 (Case of Lieutenant Colonel Fairman before Select Committee on the Orange Lodges, 1835); 152 *Journals of the House of Commons* 361,

has been uniformly recognized in the procedure of both state and federal courts.[37] It is further reflected in the practice of congressional committees prior to the enactment of § 192 in 1857; a specific direction to answer was the means then used to apprise a witness of the overruling of his objection.[38] Against this background § 192 became

---

365 (Case of John Kirkwood before Select Committee on Money Lending, 1897).

For Canadian practice, see the case of W. T. R. Preston before the Committee on Public Accounts, the Committee on Agriculture and Colonization, and the House of Commons. 41 *Journals of the House of Commons, Canada,* 298, 316, 323; 41 *id.,* Appendix No. 2, 324–327; 41 *id.,* Appendix No. 3, 250–251; 76 *Debates, House of Commons, Canada,* Session 1906, Vol. III, 4451–4535.

[37] See *Hoffman* v. *United States,* 341 U. S. 479, 486: "It is for the court to say whether his silence is justified . . . and to require him to answer if 'it clearly appears to the court that he is mistaken.' " See also Chief Justice Marshall in *United States* v. *Burr,* 25 Fed. Cas. 38, at 40, No. 14,692e: "When a question is propounded, it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness." The cases, both federal and state, are collected in Wigmore, Evidence, § 2271. See, *e. g., Carlson* v. *United States,* 209 F. 2d 209, 214 (C. A. 1st Cir.), and *Gendron* v. *Burnham,* 146 Me. 387, 405–406, 82 A. 2d 773, 784–785.

[38] See, *e. g.,* the resolution introduced by Congressman Orr proposing that one J. W. Simonton be haled before the bar of the House of Representatives for refusing to answer a question put to him by a duly-authorized committee of that body. Cong. Globe, 34th Cong., 3d Sess. 403–404 (1857). The resolution states in part:

"The committee were impressed with the materiality of the testimony withheld by the witness, as it embraced the letter and spirit of the inquiry directed by the House to be made, but were anxious to avoid any controversy with the witness. They consequently waived the interrogatory that day, to give the witness time for reflection on the consequences of his refusal, and to afford him an opportunity to look into the law and the practice of the House in such cases, notifying him that he would, on some subsequent day, be recalled. This was the 15th of January instant. On Tuesday, the 20th instant, the said J. W. Simonton was recalled, and the identical

law.[39]  No relaxation of the safeguards afforded a witness was contemplated by its sponsors.  In explaining the bill in the House, Congressman Davis expressly stated that committee powers were not increased, that no added burden was placed upon the witness, and that a "mere substitution" of a judicial proceeding for punishment at the bar of Congress was intended.[40]  The reason for enacting § 192 went to the punishment and not the offense.  It was recognized that the power of Congress to deal with a contemnor by its own processes did not extend beyond the life of any session.[41]  By making contempt of Congress a crime, a fixed term of imprisonment was substituted for variable periods of congressional custody dependent upon the fortuity of whether the contemnor had been called to testify near the beginning or the end of a session.[42]  But there is nothing to indicate that this change in the mode of punishment affected in any way the well-established elements of contempt of Congress. Since the enactment of § 192, the practice of specifically directing a recalcitrant witness to answer has continued to prevail.[43]  In fact, the very committee involved here, the

---

question first referred to was again propounded, after due notice to him that if he declined the committee would feel constrained to report his declination to the House, and ask that body to enforce all its powers in the premises to compel a full and complete response." *Id.*, at 403.  See also *id.*, 31st Cong., 1st Sess. 1716 (1850).

[39] Act of Jan. 24, 1857, c. 19, § 1, 11 Stat. 155.

[40] Cong. Globe, 34th Cong., 3d Sess. 427.

[41] *Anderson* v. *Dunn*, 6 Wheat. 204, 230–231.

[42] Cong. Globe, *supra*, note 40, at 405 *et seq.*

[43] See, *e. g.*, Cong. Globe, 40th Cong., 3d Sess. 771–772 (1869) ; *id.*, 42d Cong., 3d Sess. 952 (1873) ; 4 Cong. Rec. 1705 *et seq.* (1876) (citation of Hallet Kilbourn, involved in *Kilbourn* v. *Thompson, supra,* note 22) ; 26 Cong. Rec. 6143 *et seq.* (1894) (citation of Elverton R. Chapman, involved in *In re Chapman, supra,* note 20) ; 65 Cong. Rec. 4785 *et seq.* (1924) (citation of Harry F. Sinclair, involved in *Sinclair* v. *United States, supra,* note 33) ; 69 Cong. Rec. 2439, 5286,

House Un-American Activities Committee, originally
followed this practice [44] and recently resumed it.[45]

Giving a witness a fair apprisal of the committee's
ruling on an objection recognizes the legitimate interests
of both the witness and the committee. Just as the wit-
ness need not use any particular form of words to present
his objection, so also the committee is not required to
resort to any fixed verbal formula to indicate its disposi-
tion of the objection. So long as the witness is not forced
to guess the committee's ruling, he has no cause to com-
plain. And adherence to this traditional practice can
neither inflict hardship upon the committee nor abridge
the proper scope of legislative investigation.

## III.

Petitioner also attacks his conviction on grounds in-
volving novel constitutional issues. He contends that
the House Resolution authorizing the committee's oper-
ations is invalid under the First Amendment. In addi-
tion, petitioner contends that the trial court erred in
denying a hearing on the alleged bias of the indicting
grand jury. Our disposition of the case makes it unneces-
sary to pass on these issues.

The judgment below is reversed and the case remanded
to the District Court with directions to enter a judgment
of acquittal.

*Reversed.*

---

5353, 7239 (1928); 78 Cong. Rec. 1902, 1911–1914 (1934); 86 Cong.
Rec. 3856 (1940); 90 Cong. Rec. 8163 (1944); 97 Cong. Rec. 499
*et seq.* (1951).

[44] See, *e. g.,* the contempt citation of George Powers at 86 Cong.
Rec. 3856–3857. See also the citation of James H. Dolsen, *id.,* at
3694–3695.

[45] See contempt citation of Saul Grossman, 98 Cong. Rec. 8634–
8637.

MR. JUSTICE HARLAN, concurring.

I agree with the result reached by the Court in this case. But I must dissent from the holding made in part II of the majority opinion. The reasons for my position are stated in part II of my dissenting opinion in the *Emspak* case, decided herewith, *post,* p. 203, at p. 213. I consider those reasons equally applicable to what is shown by the record in this case.

MR. JUSTICE REED, dissenting.*

The Court in these two cases refuses to punish petitioners, witnesses before the Committee on Un-American Activities of the House of Representatives, for refusal to answer certain pertinent questions. Such refusal is declared to be a misdemeanor by 2 U. S. C. § 192.

The separate opinions are based on the conclusion that the petitioners each properly claimed for himself the privilege against self-incrimination guaranteed by the Fifth Amendment. The Court holds that questions concerning association with known communists or membership in the Party asked witnesses holding prominent positions in a local union, under investigation for communist infiltration directed at national security, might reasonably be feared as incriminatory by the witnesses.[1] For these cases I make that assumption, too. In both the cases, the Court directs remand to the trial court with directions to acquit. This disposition of the charges excludes any factual issues for decision by the trial court as to whether the witnesses did or did not claim their

---

*[This dissenting opinion applies also to *Emspak* v. *United States, post,* p. 190.]

[1] *Blau* v. *United States,* 340 U. S. 159; *Emspak* v. *United States, post,* p. 190, at p. 199; see the Court's opinion in *Quinn* v. *United States, supra,* at p. 162.

privilege. It decides that, as a matter of law, the petitioners claimed their privilege by the words used by them in answer to the questions propounded by the Committee. Since the indictments contained numerous counts covering many questions asked and the evidence showed varying reasons for not answering, the conclusion that privilege was claimed blankets all questions. Since the sentences were less than the maximum penalty for one count, if the Court's determination is wrong as to any one question, its present judgments are wrong.[2] Normally the issue as to whether a claim of privilege was made would be a matter of fact for the trial court if reasonable men might reach either conclusion. See the discussion below in the opinion of Judge Prettyman in *Quinn* v. *United States*, 91 U. S. App. D. C. 344, 348, 203 F. 2d 20, 24, and of Judge Bazelon, *id.*, at 350 and 361–362, 203 F. 2d, at 26 and 38. None of the judges of the Court of Appeals suggested approval of such action as this Court now takes in directing acquittal. See also *Emspak* v. *United States*, 91 U. S. App. D. C. 378, 203 F. 2d 54, dissent, *id.*, at 384, 203 F. 2d, at 60. This Court at least should have followed that course here.

These sweeping decisions affect the conduct of all congressional inquiries and all courts, for from the opinions there emerges a legally enforceable rule for handling hearings or prosecutions when questions raise for the witness a problem of self-incrimination. The Court, *Quinn* opinion, p. 164, requires the interrogator, once the witness' claim though "vague . . . is sufficiently definite to apprise the committee of his intention" to claim his privilege, "either to accept the claim or to ask petitioner whether he was in fact invoking the privilege." Although this phrasing, particularly the last clause, carries for me probabilities of uncertainties in future applications that former decisions

---

[2] *Sinclair* v. *United States*, 279 U. S. 263, 299 (7).

avoided,[3] it is accepted for this case as the governing rule. My conclusion is that neither petitioner here apprised the Committee that he was claiming his privilege. As shown by the cases just cited, the privilege is personal to the witness. The reach of questions into matters that might lead to his prosecution for crime may be known only to him. Therefore the witness has the burden of doing something more than suggesting a question might incriminate him. At least, in the words of the Court, he must "apprise the committee of his intention" to claim his privilege.

The purpose of having witnesses is to furnish to proper interrogators, subject to objections for materiality or the use of coercion, the actual facts they seek. Legislation can best be drafted and cases tried most fairly only when all pertinent facts are made available to those charged with legislation or maintenance of the peace. However, the Congress in the first series of Amendments to the Constitution wrote an exception to this duty in the instance where an answer would compel a person to be a witness against himself in a criminal case. In that situation, on a valid claim of privilege against self-incrimination, the witness may be excused from answering.[4] That exception should neither be shriveled nor bloated. It is designed to excuse the guilty and the innocent alike from testifying when prosecution may reasonably be feared from compelled disclosures. The importance of preserving the right to require evidence, except when a witness definitely apprises the interrogating body of a valid claim of privilege, leads us to dissent.

---

[3] *Vajtauer* v. *Commissioner,* 273 U. S. 103, 113; *United States* v. *Monia,* 317 U. S. 424, 427, dissent 439; *Rogers* v. *United States,* 340 U. S. 367, 371; cf. *Adams* v. *Maryland,* 347 U. S. 179.

[4] See *McCarthy* v. *Arndstein,* 266 U. S. 34; *Counselman* v. *Hitchcock,* 142 U. S. 547.

174

## I. Claim of Privilege.

The Court finds from the record before the Committee an apprisal by petitioners which the Committee should have understood as a claim of privilege against self-incrimination. In examining the record for this purpose, all the pertinent testimony must be considered and evaluated in the light of the purpose and abilities of the petitioners.

During an active period of national rearmament this Committee was investigating subversive and security situations in the sensitive electronic industry with a view to possible legislation.[5] The recalcitrant witnesses held important positions in the field. Mr. Quinn was a field organizer of the International Union of the United Electrical, Radio and Machine Workers. Mr. Emspak was its General Secretary. The third witness, who is not a petitioner but whose testimony is hereafter referred to, was Mr. Fitzpatrick, chief steward of the Westinghouse Corporation local. There is nothing to indicate that the witnesses had mentalities of a quality less than one would expect from experienced officials holding such responsible positions.

It will be observed from their testimony, however, that in avoiding direct answers to specific questions each one engaged in exercises in dialectics that always fell short of advising the Committee of any intention to claim his privilege. In view of the ease with which a claim can be made by any layman, the availability of personal lawyers for these witnesses and the careful avoidance of any such statement as, "I decline to answer on the ground of possible self-incrimination," I cannot hold that these

---

[5] Hearings before House Committee on Un-American Activities Regarding Communist Infiltration of Labor Unions, Part 1, 81st Cong., 1st Sess. 541.

witnesses evidenced by their testimony an intention to claim privilege. The fact that a claim of privilege would subject the witnesses to criticism in some quarters, of course, has no bearing upon the necessity to assert one's rights. This is emphasized by the fact that long ago this Court declared that no moral turpitude is involved in refusing to answer under the protection of the privilege.[6]

While the trial and appellate courts each had only a printed record of the testimony, one group, the subcommittees themselves, had the best opportunity to appraise disinterestedly the fact of whether Messrs. Quinn and Emspak claimed the privilege. The questions and answers were both asked by the counsel and answered by the witnesses in the hearing of the Committee. In citations of Quinn and Emspak to the House for contempt, the Committee certified that the refusal of each "to answer the aforesaid questions deprived your committee of necessary and pertinent testimony . . . ."[7] It can hardly be contended that the Committee did not know a claim of privilege against answering incriminating questions would have excused the witnesses from answering.

In view of the basis of the Court's decision made on its own examination and appraisal of the record, I must necessarily set out for discussion much of the testimony to determine whether the witnesses claimed the privilege.[8] The pertinent evidence follows.

After testifying at some length, the petitioner was asked: "Mr. Emspak, are you acquainted with Joseph

---

[6] *Sinclair* v. *United States,* 279 U. S. 263, 299.

[7] Proceedings against Julius Emspak, H. R. Rep. No. 2847, 81st Cong., 2d Sess., p. 10; same against Thomas Quinn, H. R. Rep. No. 2857, p. 3.

[8] Any person who desires to see the complete essential testimony may consult the Proceedings, cited in the preceding note. See also H. R. Rep. No. 2856.

Persily?" Petitioner did not answer the question but made the following statement:

"Mr. Emspak. Mr. Chairman, I would like to say something at this point.

"Mr. Moulder. You mean in response to the question?

"Mr. Emspak. I will answer the question; yes, in response to the question and as a statement of position.

"What I say revolves around two points, one organizationally and another as an individual. Organizationally, my job as an officer of this union is to represent the interest of the membership as they determine it at the annual conventions and at other means they have of getting together and expressing themselves. My job is to administer that aspect to the best of my ability, using one very simple measuring stick, and that is: Does a given policy or action contribute to the well-being of the membership, individually and collectively?

"As an individual I would like to say one thing, and that is this: The line of questioning that counsel is developing now is a line that has been used on numerous occasions by this committee and other congressional committees in an attempt to harass the union, its leadership, and its members. It is a line of questioning that goes against my grain as an American. I was born in this country. Everything I am—

"Mr. Moulder. How long will this statement take, Mr. Emspak?

"Mr. Emspak. About two or three more minutes.

"Mr. Moulder. Proceed.

"Mr. Emspak. Everything I am, I owe to the rich heritage and tradition of this country. I do not

believe that a committee of this kind, especially in view of the recent record of this committee where it stooped to interfere in the partisan affairs of a local union, or any congressional committee, because of the rich tradition of this country which, if not perverted, will lead to a greater and better country—I don't think a committee like this or any subcommittee has a right to go into any question of my beliefs, my associations, or anything else. I have a couple of kids. They have a stake in this country, too.

"Mr. Moulder. I want to give you full opportunity to express yourself in answer to the question, but you are making an oration now.

"Mr. Emspak. It is not an oration. It happens to be a very profound personal feeling.

"Mr. Moulder. What is the question?

"Mr. Tavenner. The question is: Are you acquainted with Joseph Persily.

"Mr. Moulder. How do you spell that?

"Mr. Tavenner. P-e-r-s-i-l-y.

"Mr. Emspak. Because I have a stake in this country—

"Mr. Moulder. You are not answering the question. He asked you if you are acquainted with this man.

"Mr. Emspak. I will answer it.

"Mr. Moulder. Are you or not?

"Mr. Emspak. I was on the verge of answering it.

"Mr. Moulder. If you have any explanation to make you will be permitted to do so after you answer the question.

"Mr. Emspak. Because of my interest in what is going on these days, because of the activities of this committee—

"Mr. Moulder. Are you going to answer the question?

"Mr. Emspak. Because of the hysteria, I think it is my duty to endeavor to protect the rights guaranteed under the Constitution, primarily the first amendment, supplemented by the fifth. This committee will corrupt those rights.

"Mr. Moulder. Do you think it corrupts you to answer the question?

"Mr. Emspak. I certainly do.

"Mr. Moulder. Why does it corrupt you?

"Mr. Emspak. Your activities are designed to harm the working people of this country. Every action this committee has ever taken has done that. You interfered last summer in the election of a local union at the request of a priest. You know that. You dragged down the prestige of this country.

"Mr. Moulder. You are not going to take over this committee.

"Mr. Emspak. I don't want to.

"Mr. Moulder. And your statements are preposterous. The purpose of this committee is to expose communism as it exists in this country. What is the question?

"Mr. Tavenner. Are you acquainted with Joseph Persily?

"Mr. Emspak. For the reasons I stated before, I answered it.

"Mr. Moulder. Then you refuse to answer the question?

"Mr. Emspak. No. I answered it.

"Mr. Tavenner. Are you or are you not acquainted with Joseph Persily?

"Mr. Emspak. I answered the question.

"Mr. Tavenner. Your replies are a refusal to comply with the request to answer it?

"(Witness confers with his counsel.)

"Mr. Moulder. The record will reveal that you have not answered the question.

"Mr. Emspak. I have answered it to the best of my ability under the circumstances."

In answer to subsequent questions, the petitioner simply referred to his prior answer. Later on, the following statements were made:

"Mr. Emspak. Mr. Chairman, on these questions, which are all essentially the same, of course, when this hearing was announced according to the press reports, at least, it was announced because this committee presumably was interested in finding out things with reference to individuals in our organization by using whatever means it has at its disposal, and for the purpose of trying to perhaps frame people for possible criminal prosecution.

"I don't see how or why any individual should be subjected to that kind of questioning here if he is going to maintain, you know, his feelings on these questions, and I tried to express the feeling before when you interrupted me. I just don't intend, as I said then, to be a party to any kangaroo court proceedings of this committee or any other congressional committee. I think I have the right to reserve whatever rights I have in that respect to whatever appropriate bodies may be set up to deal with questions that come up.

"Mr. Moulder. Do you mean to say you have people in your organization who have information that would subject you to criminal prosecution?

"Mr. Emspak. No; I don't, Mr. Chairman. As a basic proposition—and it has worked over the years and over the last few months as far as this committee is concerned—a slick job—

"Mr. Moulder.  Do you know them or not?

"Mr. Emspak.  That does not concern this committee at all.

"Mr. Moulder.  Is it your feeling that to reveal your knowledge of them would subject you to criminal prosecution?

"Mr. Emspak.  No.  I don't think this committee has a right to pry into my associations.  That is my own position."

No more of the record is printed, as the excerpt shows the exchange between the Committee and petitioner upon which Count I of the indictment and the constitutional issues arising thereunder are based.  This related to his acquaintanceship with Joseph Persily, a man who had been listed, according to a stipulation, as a person named as an official "of the UERMWA with Communist or Communist Front Affiliations."  Nothing more favorable to petitioner's position appears on the questions examined or any other question.

As the *Emspak* case offers for me a clear example of failure to claim his privilege, I think it better not to encumber this opinion unnecessarily with quotations from the *Quinn* case.

In the *Quinn* case, the witness adopted in its entirety the testimony of a former witness, Mr. Thomas J. Fitzpatrick, chief steward of Local No. 601, United Electrical, Radio and Machine Workers of America.  Mr. Quinn's testimony establishing his reliance on Mr. Fitzpatrick's evidence will be found in this Court's opinion in the *Quinn* case, n. 8, *ante*, p. 158.  The hearing opened with a declaration by Mr. Fitzpatrick of minority rights to secrecy as follows:

"The Constitution of this country provides certain protection for minorities and gives the privilege for people to speak and think as they feel that they

should and want to. It also gives the privilege that people can have opinions or beliefs that may be unpopular. In my opinion, it gives them the right to hold those opinions secret if they so desire. This is a protection of the first amendment to the Constitution, supplemented by the fifth amendment.

"Mr. Wood. What is?

"Mr. Fitzpatrick. The right of the people guaranteed by the Constitution."

This certainly indicated no claim of the privilege against self-incrimination. Mr. Fitzpatrick was then asked: "Are you now or have you ever been a member of the Communist Party?" After fencing with the Committee about prying into his mind, he said:

"Mr. Fitzpatrick. I will answer the question. The Constitution guarantees the right to me and every other citizen to have beliefs, whether they are popular or unpopular, and to keep them to themselves if they see fit, and I have no intention of being a party to weakening or destroying that protection in the Constitution. I feel when I take this position that I am one of the real Americans, and not like some of the phonies who appear here."

Later on he was asked whether he had asked a Mr. Copeland to sign an application for membership in a Communist organization. In answer to that question this occurred:

"Mr. Fitzpatrick. Mr. Chairman, do I have to give you my answer again?

"Mr. Wood. I just want to know whether you did that one thing.

"Mr. Fitzpatrick. I say if I did or if I did not, regardless of what I did, it is not the affair of this committee to pry into this kind of action.

"Mr. Wood.   And for that reason do you decline to answer the question?

"Mr. Fitzpatrick.   I stand on the protection of the Constitution, the first and fifth amendments.

"Mr. Wood.   And for those reasons decline to answer the question further?

"Mr. Fitzpatrick.   I have answered the question.

"Mr. Wood.   I say, do you decline to answer it further?

"Mr. Fitzpatrick.   I have no further comment on it."

The two references to the First and Fifth Amendments are the only phrases in the whole examination that could be thought to refer to a claim of immunity against self-incrimination.

From these vague statements of Messrs. Quinn and Emspak the Court draws the conclusion that they were sufficient to apprise the Committee of the witnesses' intention to claim the privilege against self-incrimination. The Court finds support for its theory of "intention" to claim privilege from a statement in the Government's brief in the *Quinn* case set out below.[9]   With all respect,

---

[9] "Under these circumstances, we contend that petitioner did not adequately inform the Committee that he was claiming the protection of the privilege.

"Moreover, we feel bound to point out the probability that petitioner's ambiguous references to the Fifth Amendment (and those of the petitioner Emspak in No. 9), which he now contends constituted a claim of privilege, were phrased deliberately in such vague terms so as to enable petitioner (and Emspak) to obtain the benefit of the privilege without incurring the popular opprobrium which often attaches to its exercise.   This suggestion is not based merely upon the obvious fact that it would have been extremely easy for petitioner to have informed the Committee that answers to its questions might incriminate or endanger him.   It is also based upon facts of record, and matters appropriate for judicial notice, which reveal that petitioner (and Fitzpatrick and Emspak) had compelling

I fail to see any concession by the Government of evidence that should apprise the Committee of a claim of privilege against self-incrimination. The first sentence of the quotation from the brief emphatically denies the Court's assumption.

What the records show to me is a calculated effort by Messrs. Quinn, Emspak and Fitzpatrick to hinder and delay a congressional committee in its effort to bring out facts in order to determine whether or not to undertake legislation. Such quibbling evades the basis for an understanding of the attitude of the witness as to privilege. It does not apprise the Committee of the claim of privilege and should not be held permissible. Factual testimony is the means for the ascertainment of truth in legally organized inquiries. Silence brings the proceedings to a dead end. The burden is on the witness to advise his interrogators of a claim to privilege in understandable terms.[10] In the context of this testimony, the adoption by Mr. Quinn of Mr. Fitzpatrick's reference to the First and Fifth Amendments smacks strongly of a "due process" Fifth Amendment claim. Mr. Fitzpatrick had been speaking of his right of privacy, speech and association, not of the privilege against self-incrimination. He then added:

> "Mr. Chairman, if you want to ask me questions about my actions of loyalty, question my loyalty, you have a right to do so and I will answer them. So far as my political opinions, I have stated my position on that. You are asking the same question in a different way. But if my memory is right, there was no such thing as a Communist Party when that affidavit is supposed to have been."

and immediate reasons to refrain from making any public statements from which it might be inferred, properly or not, that they were Communists or Communist sympathizers." Govt. br., 33–34.

[10] See note 3, *supra.*

The same attitude shows through Mr. Emspak's testimony. In addition there was a direct refusal by Mr. Emspak to claim privilege. See pp. 179–180, *supra*.

The Court suggests that this should not be construed as a waiver of the claim and cites *Smith* v. *United States*, 337 U. S. 137, 151. I do not think the *Smith* case apposite. In that case there had been a clear claim of privilege for immunity. We held that required a definite, unambiguous waiver. Here there was, in my view, no claim of privilege.

The opinion of the trial court, printed only in the record, pp. 224–227, holds "The defendant failed to assert [the privilege]." Six of the nine members of the Court of Appeals held that Emspak had not claimed. Three did not reach that issue.

I concur with the Court in its assertions of the value of the self-incrimination clause—that it may be used as a shield by guilty and innocent alike—and that it should be construed liberally as it has been to cover more than the literal reading of the phrase "No person . . . shall be compelled in any criminal case to be a witness against himself" would suggest.[11] This sympathetic attitude toward the clause should not lead us to intrude our ideas of propriety into the conduct of congressional hearings.

---

[11] See, for example, *Counselman* v. *Hitchcock*, 142 U. S. 547, 562; *Blau* v. *United States* (two cases), 340 U. S. 159 and 332 (privilege available at grand jury proceedings); *McCarthy* v. *Arndstein*, 266 U. S. 34, 40, "The privilege is not ordinarily dependent upon the nature of the proceedings in which the testimony is sought or is to be used. It applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it. The privilege protects a mere witness as fully as it does one who is also a party defendant" (proceedings in bankruptcy); *Brown* v. *Walker*, 161 U. S. 591, and see also *Graham* v. *United States*, 99 F. 2d 746 (administrative proceedings); see also *Wood* v. *United States*, 75 U. S. App. D. C. 274, 128 F. 2d 265 (preliminary hearings).

The rule laid down by the Court today merely adds another means for interference and delay in investigations and trials, without adding to the protection of the constitutional right of freedom from self-incrimination. This is contrary to the policy of Congress to get information from witnesses even with a claim of immunity, through the Compulsory Testimony Act of August 20, 1954, 68 Stat. 745.

## II. DIRECTION TO ANSWER.

The Court advances a second ground in the *Quinn* and *Emspak* cases for its direction that the District Court enter a judgment of acquittal. This is that a deliberate intent to refuse to answer the Committee's questions is required for the judgment of contempt. The Court explains, *Quinn* case, p. 166, that intent may be implied only when the witness is "clearly apprised that the committee demands his answer notwithstanding his objections," and, *Emspak* case, p. 202, "without such apprisal there is lacking the element of deliberateness necessary for a conviction under § 192 for a refusal to answer." The Court concludes that the witness was not "specifically" directed to answer, or otherwise informed as to the disposition of his objections.

The Court must admit, as it does, *Quinn* opinion, p. 162, that no particular form of words is required. On the other hand, I must admit that a witness must be clearly apprised that his claim of the freedom from an obligation to answer is not accepted by the interrogator.[12] I agree that the offense punishable under the statute is a deliberate, intentional refusal—not an inadvertence, accident or

---

[12] *Fields* v. *United States,* 82 U. S. App. D. C. 354, 164 F. 2d 97, 100; *Bart* v. *United States,* 91 U. S. App. D. C. 370, 372–373, 203 F. 2d 45, 48; *Emspak* v. *United States,* 91 U. S. App. D. C. 378, 380–381, 203 F. 2d 54, 56.

misunderstanding.[13] Good faith in refusing to answer, however, is no defense so long as the refusal is intentional, deliberate. *Sinclair* v. *United States,* 279 U. S. 263, 299, points out that:

> "The gist of the offense is refusal to answer pertinent questions. . . . Intentional violation is sufficient to constitute guilt."

*United States* v. *Murdock,* 284 U. S. 141, involved a statute very similar to the one here involved. In that case, Murdock had been called to testify before an Internal Revenue Agent and refused to answer certain questions on the ground that he might be incriminated under state law. We said in that case:

> "While undoubtedly the right of a witness to refuse to answer lest he incriminate himself may be tested in proceedings to compel answer, there is no support for the contention that there must be such a determination of that question before prosecution for the willful failure so denounced. By the very terms of the definition the offense is complete at the time of such failure." 284 U. S., at 148.

There was no direction to answer in either case. While the point was not raised, their holding as to what establishes the offense does not include a specific direction to answer as one of the elements.

While the Court held in *Sinclair* that deliberate refusal was all that was required to consummate the offense under 2 U. S. C. §192, at the same time we were at pains to point out "There was no misapprehension" on the part of the witness "as to what was called for." P. 299. It is because the refusal must be intentional, that the witness

---

[13] *Townsend* v. *United States,* 68 App. D. C. 223, 229, 95 F. 2d 352, 358; *Fields* v. *United States,* 82 U. S. App. D. C. 354, 357, 164 F. 2d 97, 100.

must know that his excuses for not answering have not been accepted by the Committee. When a witness interposes objections to testifying which are not frivolous, it is difficult to say he intentionally refused to answer when the interrogation continues without pause to some other question. I agree that the Committee cannot, in fairness to the witness, lull him into thinking that his refusal to answer is acceptable and then cite him for contempt. Refusal under such circumstances would not be deliberate. However, specific direction to answer is not necessary; only intentional refusal is.

The Court suggests, n. 36, *Quinn* case, that congressional committees follow the practice of other legislative bodies and determine first the validity of the witness' reason for failure to answer and then direct him to answer. The defect in that analogy is that the Court seems to assume in its note a formal vote and a specific direction to answer. I think such a specific direction is inconsistent with its page 170 admission that no ritualistic formula is required. No provision of the statute, nor of any rule of Congress is cited by the Court to support a requirement of specific direction. The Court of Appeals held direction to answer unnecessary so long as the witness knew that the Committee had not acceded to his refusal.[14] As I stated above, in my view it is sufficient if the witness knows his excuses are not acceptable to the Committee and that he is required to answer. Whether or not the witnesses knew this in these two cases is the question on this second point.

The Court holds that the witnesses did plead the privilege and were not advised that the Committee refused to accept their pleas. I disagree. After Mr. Quinn had adopted Mr. Fitzpatrick's words as his own method of

---

[14] The instant case and the *Emspak* and *Bart* cases all deal at length with this question. 91 U. S. App. D. C., at 349, 380–381, 374–375, 203 F. 2d, at 25, 56, 50. See also, comments, 40 Geo. L. J. 137; 41 Geo. L. J. 433.

refusing to answer the question as heretofore discussed, it will be seen that Mr. Wood, a Committee member, said to Mr. Quinn:

"Mr. Wood. You have stated your position. Having enunciated your sentiments and your position, will you now answer the question whether you are now or ever have been a member of the Communist Party, or do you decline to answer?

"Mr. Quinn. I decline to discuss with the committee questions of that nature."

This, I think, advised Mr. Quinn that the Committee refused to accept his reply as a satisfactory excuse and required him to proceed.

I think, too, that Mr. Emspak was advised his answer was not accepted and that he was required to proceed. When he was asked repeatedly as to whether he was acquainted with Joseph Persily, he said again:

"Mr. Emspak. For the reasons I stated before, I answered it.

"Mr. Moulder. Then you refuse to answer the question?

"Mr. Emspak. No. I answered it.

"Mr. Tavenner. Are you or are you not acquainted with Joseph Persily?

"Mr. Emspak. I answered the question.

"Mr. Tavenner. Your replies are a refusal to comply with the request to answer it?

"(Witness confers with his counsel.)

"Mr. Moulder. The record will reveal that you have not answered the question.

"Mr. Emspak. I have answered it to the best of my ability under the circumstances."

On continued questioning as to Mr. Persily, he continued, "I will give the same answer." I cannot but conclude, as did the lower courts, that the witness Emspak was ade-

quately informed that his objections were refused and that he must answer.

The Court directs acquittal of both petitioners on the grounds of claim of privilege and failure to specifically overrule their objections or direct them to answer. I disagree with both grounds. Confining expression of my views to those issues, I dissent.

MR. JUSTICE MINTON joins in so much of this opinion as applies to *Emspak* v. *United States, post,* p. 190.