**Lloyd BARENBLATT, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 13327.**

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 27, 1956.

Decided Jan. 3, 1957.

Mr. David Scribner, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. David Rein, Washington, D. C., was on the brief, for appellant.

Mr. John D. Lane, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., Lewis Carroll and William Hitz, Asst. U. S. Attys., were on the brief, for appellee.

Before WASHINGTON, BASTIAN and BURGER, Circuit Judges.

BASTIAN, Circuit Judge.

Appellant was tried, convicted and sentenced under 2 U.S.C.A. § 192 [1] (contempt of Congress). From this conviction the present appeal was taken.

The factual situation disclosed by the record is as follows: On June 28, 1954, one Francis X. T. Crowley testified before a subcommittee of the Committee on Un-American Activities of the House of Representatives concerning his past membership and activities in the Communist Party, and identified the appellant as a member of the Haldane Club of the Communist Party while appellant was a graduate student and instructor at the University of Michigan. On that same day, appellant appeared before the subcommittee in response to its subpoena, at which time, after certain preliminary inquiries, appellant was asked the questions which he refused to answer. These refusals are the basis for his indictment, which charges that appellant "unlawfully refused to answer" the following questions:

"Count One: Are you now a member of the Communist Party?

"Count Two: Have you ever been a member of the Communist Party?

"Count Three: Now, you have said that you knew Francis Crowley. Did you know Francis Crowley as a member of the Communist Party?

"Count Four: Were you ever a member of the Haldane Club of the Communist Party while at the University of Michigan?

"Count Five: Were you a member while a student of the University of Michigan Council of Arts, Sciences, and Professions?"

The indictment charges that these questions "were pertinent to the question then under inquiry," and that the subcommittee was conducting hearings at the time pursuant to its enabling resolution.[2] This law establishes the Committee on Un-American Activities and vests in it, and its duly constituted subcommittees, the duty:

"* * * to make from time to time investigations of (i) the extent, character, and objects of un-American propaganda activities in the United States, (ii) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (iii) all other questions in relation thereto that would aid Congress in any necessary remedial legislation."

At the time of appellant's appearance, the subcommittee was conducting an inquiry into communism in the field of education, and the record reflects that appellant had knowledge of this.

1. *"Refusal of witness to testify.* Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

2. Public Law 601, Sec. 121, 79th Cong., 2d Sess., 60 Stat. 828, and H.R.Res. 5, 83d Cong., 1st Sess. (1953).

## I

■ The first ground urged for reversal is that the indictment is fatally defective in that it does not plead a deliberate and intentional or knowing refusal to answer. This specific question was ruled on by this court contrary to appellant's contention in United States v. Deutch, 1956, 98 U.S.App.D.C. 356, 235 F.2d 853.

■ The argument is also advanced that the indictment is defective in that it does not describe the matter into which the subcommittee was inquiring at the time appellant appeared before it. The indictment alleges an unlawful refusal to answer "questions which were pertinent to the question then under inquiry," which inquiry was made pursuant to the subcommittee's enabling resolution. Thus, it appears that the indictment stated all the elements of the offense charged and served notice on appellant as to what conduct on his part constituted the alleged offense. This satisfies the requirements of Fed.R.Crim.P. 7(c), 18 U.S.C.A. See United States v. Josephson, 2 Cir., 1947, 165 F.2d 82, certiorari denied, 1948, 333 U.S. 838, 68 S.Ct. 609, 92 L.Ed. 1122.

■ It is also contended that the indictment is fatally defective in that it alleges a refusal to answer questions before a subcommittee of a committee, and that Congress did not intend to make it a crime to refuse to answer questions of a subcommittee. Appellant urges that Congress was fearful of having penal sanctions imposed upon those who refused to answer questions propounded by subcommittees, as Congress considered subcommittees more subject to partisanship and more likely to abuse their powers than full committees. We disagree. Nothing has been shown which reflects that Congress has indicated such belief. We can only construe the statute in the light of the obvious purpose for its enactment. That purpose was to discourage the impairment of the vital investigative function of Congress.

Fields v. United States, 82 U.S.App.D.C. 354, 164 F.2d 97, certiorari denied, 1948, 332 U.S. 851, 68 S.Ct. 355, 92 L.Ed. 421. The function Congress sought to protect is as often committed to subcommittees as it is to full committees of Congress, as indeed it must be.

Construing the statute in a manner consistent with its obvious purpose, Vermilya-Brown Co. v. Connell, 1948, 335 U.S. 377, 69 S.Ct. 140, 93 L.Ed. 76, United States v. Brown, 1948, 333 U.S. 18, 68 S.Ct. 376, 92 L.Ed. 442, The Emily and The Caroline, 1824, 9 Wheat. 381, 22 U.S. 381, 6 L.Ed. 116, we hold that Congress intended the word "committee" in its generic sense, which would include subcommittees.

## II

Next, appellant contends that the subcommittee failed to consider and overrule his objections to the questions asked him, and that, therefore, there could be no proof beyond a reasonable doubt of a criminal intent to refuse to answer. He insists that to meet this burden the subcommittee must be shown to have considered his objections, to have overruled them, and then to have directed him to answer. In support, appellant cites Quinn v. United States, 1950, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964, Emspak v. United States, 1950, 349 U.S. 190, 75 S.Ct. 687, 99 L.Ed. 997, and Bart v. United States, 1950, 349 U.S. 219, 75 S.Ct. 712, 99 L.Ed. 1016.

The record of the subcommittee hearing for the day appellant appeared was admitted in evidence at the trial.[3] From that record, we are convinced that appellant did communicate his objections to the subcommittee and that he was clearly directed to answer each of the questions. Furthermore, it is entirely clear that appellant had ample opportunity to state any additional objections he may have had.

Appellant came before the subcommittee with an eleven-page written state-

3. Hearings Before the House Committee on Un-American Activities on Communist Methods of Infiltration (Education—Part 9), 83d Cong., 2d Sess. (1954), Gov. Exhibit No. 8.

ment, which he characterized as his objections to the questions asked of him. Whenever he was asked a question which he refused to answer, appellant asked permission, or attempted without permission, to read the prepared statement. The Chairman ruled that it was a preliminary statement, which, under the rules of the subcommittee (with which appellant admitted familiarity) had to be filed a reasonable time in advance of appearance before the subcommittee.[4] At one point appellant asserted:

"I am objecting on these grounds, and I will not answer any questions about which the list of objections is read: my political beliefs; my religious beliefs; any other personal and private affairs; my associational activities.

"I will not answer any of those questions on the grounds of my objections in this statement which I again respectfully request that I be able to read at this point to get into the record the objections so that we can proceed from that point."

This assertion by appellant was made before he was directed to answer the question set forth in the first count of the indictment.

Prior to making the objection referred to above, appellant had stated, in response to a question:

"Sir, I would like here to state my objections to the power and jurisdiction of this committee to inquire into my political beliefs, my religious beliefs, and any other personal and private affairs * * *."

The Chairman, as stated, had regarded the written statement as a preliminary one and had ruled that it would be taken under advisement as to whether or not it might be inserted into the record. Faced with continued refusal to answer the questions and appellant's repeated attempts to read the lengthy statement, the Chairman waived compliance with the rules of the subcommittee and accepted the statement into the record. Thereafter, when appellant refused to answer a question, he referred to the statement, as the subcommittee suggested that he do, as the basis of his refusal. The record reflects that one member of the subcommittee had read the statement but it does not show that the other members had done so. It is this upon which appellant relies when he argues that the subcommittee failed to consider his objections. With that position we cannot agree.

First, appellant did communicate to the subcommittee the general basis of the objections contained in his written statement. Secondly, one member of the subcommittee, shown by the record to have read the statement, indicated his belief that the statement contained no valid grounds for refusal to answer; and, in admitting the statement into the record, the Chairman indicated that he was relying on that member.

■ We cannot, within the limited power of a court to review the procedures of a congressional committee, insist that such a committee interrupt its proceedings for detailed examination of a lengthy attack on its power to ask a question or to make any inquiry at all.[5] Certainly, the subcommittee had the right to insist that objections be cast in a reasonable form.

Thirdly, to the extent that appellant had an objection which was not actually

---

4. The statement can best be described as a lengthy legal brief attacking the jurisdiction of the committee to ask appellant any questions or to conduct any inquiry at all, based on the First, Ninth and Tenth Amendments, the prohibition against bills of attainder, and the doctrine of separation of powers. This brief cited more than twenty Supreme Court decisions, some of which do not concern the congressional power of investi-

gation; and, in several instances, dissenting opinions were cited.

5. Cf. Eisler v. United States, 1948, 83 U.S. App.D.C. 315, 170 F.2d 273, certiorari dismissed, 1949, 338 U.S. 883, 70 S.Ct. 181, 94 L.Ed. 542; Barsky v. United States, 1948, 83 U.S.App.D.C. 127, 167 F.2d 241, certiorari denied 334 U.S. 843 68 S.Ct. 1511, 92 L.Ed. 1767.

communicated to the subcommittee, he has no one to blame but himself. The record does not disclose that the subcommittee denied appellant a right to object to questions or that it was in any way abusive in its treatment of him. On the contrary, the subcommittee demonstrated not only considerable patience but active interest in determining what appellant's objections were. This was true even to the extent that appellant was asked several times if the grounds for his objections encompassed the Fifth Amendment privilege against self-incrimination, which he stated they did not.

■ Briefly stated, our conclusions are: that appellant actually apprised the subcommittee of his objections; that the subcommittee found them unacceptable and directed appellant to answer; that the courts cannot require a committee to make a detailed study of what may be fairly described as a lengthy legal brief before it directs a witness to answer; that appellant had numerous opportunities to make known any additional objections he may have had but that he instead insisted upon reading his eleven-page statement; that that statement was read by one member of the subcommittee and found unpersuasive; and that the Chairman, relying on this member's knowledge of the statement, and its purport as communicated by the witness, directed an answer to each question. Therefore, we must hold that appellant's refusals to answer were at his own risk.

Quinn v. United States, supra, is not inconsistent with our view; we read that case as buttressing our conclusions. It concerned a witness who, instead of stating the grounds of his objections to questions of a congressional committee, represented his objections as being the same as those interposed by a previous witness, which objections had been vague and ambiguous. The Supreme Court held that, though Quinn had only vaguely asserted an objection based on the Fifth Amendment, the committee should have overruled his objection and specifically directed him to answer, before he could be convicted for contempt of Congress. It is noteworthy that the Supreme Court stated:

"But the fact that a witness expresses his intention [to object on grounds of the Fifth Amendment] in vague terms is immaterial so long as the claim is sufficiently definite to apprise the committee of his intention. As every one agrees, no ritualistic formula is necessary in order to invoke the privilege." 349 U.S. at page 164, 75 S.Ct. at page 674.

Consistent with Quinn, we conclude that appellant did apprise the subcommittee of his objections based on the First Amendment. Certainly, there is no doubt here that the subcommittee, when it directed appellant to answer each question, knew that appellant objected. It knew the general bases of the objections and rejected them. It gave him an opportunity to make any objections not communicated. It then directed him to answer each question set forth in the indictment.

### III

■ Appellant next contends that the primary purpose of the subcommittee's inquiry was to "expose" his beliefs and associations and that, therefore, the subcommittee exceeded the bounds of its investigative power. There can be no doubt that Congress has the power of inquiry and investigation when the inquiry or investigation is upon a subject concerning which Congress may legislate. The very resolution establishing the committee indicates that the subject under inquiry was one concerning which Congress could legislate. The fact that such an inquiry or investigation may reveal or "expose" some facts embarrassing to some one is incidental and without effect upon the validity of the inquiry.

Evidence was presented at the trial to show that the House Committee on Un-American Activities had been engaged in a continuing investigation into communist methods of infiltration and that one aspect of this investigation

dealt with the field of education.[6] The trial court found that it was as a part of this larger and continuing study that appellant was called to testify.

The committee Chairman opened the first hearing on the subject of communist infiltration into the field of education on February 25, 1953, by stating the nature and purpose of the inquiry.[7]

▮ Appellant urges that a statement in the Annual Report of the Committee to the effect that hearings were set up to demonstrate to the people of Michigan the infiltration into the field of education in Michigan "and the identity of those individuals responsible for its success * * *" shows that "exposure," not legislation, was the point and purpose of the hearings. This statement, in context, is part of an extended discussion of the whole activity of this committee and cannot be regarded as a statement of the sole or primary objective and, however it may conflict with the broader objectives, does not justify reversal of appellant's conviction. Courts must presume congressional investigations to have valid legislative purposes. Townsend v. United States, 68 App.D.C. 223, 95 F.2d 352, certiorari denied, 1938, 303 U.S. 664, 58 S.Ct. 830, 82 L.Ed. 1121. Since the statement relied on does not negate the presence of other, and we think legitimate, purposes of the inquiry, the presumption of valid purposes is still operative and unrebutted. A reading of the full report indicates that the primary purposes of the inquiry were in aid of legislative processes.

Examination of the report shows that legislative recommendations were made by the committee " * * * based upon investigations and hearings, in the year, 1954." It is unnecessary for present purposes to comment on those recommendations except to say that they called for significant legislation, and illustrate that the committee did in fact recommend legislation based upon investigations and hearings in 1954, perhaps including the very hearing at which appellant testified. Apparently "exposure," if a purpose of the hearing in question, was not the primary purpose.

▮ The subcommittee was investigating communist infiltration in the field of education, and did so pursuant to its duty to investigate the extent, character, and objects of un-American propaganda activities in the United States, and all other questions related thereto that would aid Congress in its legislative function. Taking this into consideration, together with the statement of the Chairman at the time the inquiry was inaugurated in February 1953, as well as the statement of the committee counsel on the morning appellant appeared to testify,[8] we conclude that the subcommittee's dominant purpose in examining appellant was to acquire information which it regarded as useful in formulating legislative recommendations. This is a more valid appraisal than would result from concentrating on one isolated statement in the Annual Report. So long as competent evidence establishes a substantial legislative purpose in calling a witness before a congressional committee, and in its examination of him, we will not balance this purpose against other motivations. Once it is proven that the committee felt induced to call a witness in order to acquire information in aid of legislative processes, we think our limited function is exhausted.

---

6. Annual Report of the Committee on Un-American Activities for the Year 1953, H.R.Rep. No. 1192, 83d Cong., 2d Sess. (1954).

7. For the statement of the Chairman see the appendix hereto.

8. Communist Methods of Infiltration (Education—Part 9), note 3 supra, at 5754:

"The field covered will be in the main communism in education and the experiences and background in the party by Francis X. T. Crowley. It will deal with activities in Michigan, Boston, and in some small degree, New York. Without further ado, Mr. Chairman, if I have your permission I will call the witness."

882

■ We are next asked to decide whether Congress possesses the power to investigate citizens who are engaged in the educational systems of the country. Appellant maintains that Congress cannot do this because the field of education has been reserved to the states, and that, under the Tenth Amendment, Congress has no authority to legislate in that sphere.

We must ascertain specifically the subject under inquiry at the time appellant appeared as a witness before the subcommittee. The official report of the Committee on Un-American Activities, which contains the testimony of appellant before the subcommittee, is entitled "Communist Methods of Infiltration (Education—Part 9)." This report indicates that, on the day appellant was heard by the subcommittee, the Chairman asked the committee counsel to state the purposes and reasons for the hearing. Counsel stated, among other things, that Crowley, a formerly recalcitrant witness, had volunteered to come before the subcommittee and that "[t]he field covered will be in the main communism in education and the experiences and background in the party by Francis X. T. Crowley." The same day that the subcommittee heard Crowley, it examined appellant. Thus, we see that the title given the inquiry, "Communist Methods of Infiltration (Education—Part 9)," was consistent with the announced subject of the inquiry at the time appellant appeared. Looking further, the nature, purpose, and hope of the committee, when it began this general, continuing inquiry in February 1953, can be determined by examining Government Exhibit No. 7.[9] We take these statements of the Chairman as conclusive of the purpose of the inquiry pursuant to which appellant was called as a witness.

The inevitable result is that the purpose and nature of the inquiry was to determine communist methods of infiltration in the field of education. There is no indication of a congressional desire or attempt to examine curricula, content of text books, administration of schools, or criteria for employing and discharging teachers. Indeed, the committee's official report on this investigation negatives any such interpretation of the intent of Congress. There is nothing to suggest that education, as such, was any more involved here than were labor unions and the motion picture industry in earlier inquiries by this same congressional committee. Convictions of witnesses called pursuant to both of these latter investigations have been affirmed in the courts.[10]

While it is true, as appellant points out, that Congress has broader powers to enact legislation in the field of labor than it does in the field of education, it is not true that persons who incidentally happen to be teachers have greater immunity from inquiry into their activities than do labor leaders and screen writers, when those activities relate to matters which are a legitimate concern of the Congress. By virtue of their great profession, teachers owe a higher duty, morally at least, to their country and its citizenry; but their status as teachers does not confer upon them a right not to have their separate or collateral activities inquired into when the same activities by others may be.

Shortly before appellant appeared before the subcommittee, its parent body had recommended to the Congress, and Congress had enacted, the Veterans' Readjustment Assistance Act of 1952, 66 Stat. 667,[11] which provides that educational stipends shall not be paid to veterans in attendance at educational institutions listed by the Attorney General as totalitarian, fascist, communist or subversive. This is significant in that it demonstrates a valid legislative interest in the incidence of communist infiltration

9. See appendix.

10. See, e. g., Flaxer v. United States, 1956, 98 U.S.App.D.C. 324, 235 F.2d 821; Lawson v. United States, 1949, 85 U.S. App.D.C. 167, 176 F.2d 49, certiorari denied, 1950, 339 U.S. 972, 70 S.Ct. 994, 94 L.Ed. 1379.

11. 38 U.S.C.A. § 933.

into educational institutions and the number, location and identity of communists in the schools, in order that Congress might be informed of a need to extend or repeal the Act.

■■■ American colleges and universities are holders of contracts with the Government to conduct a variety of research projects of far-reaching consequence to the national security. They are frequently petitioners for and recipients of substantial grants not directly related to national security but involving expenditure of tax revenues. Thus, there are various other valid reasons for a congressional committee to launch an investigation of the type being conducted when appellant appeared as a witness. Congress has the recognized authority to conduct inquiries to determine if projects crucial to national defense, and paid for from public funds, are being carried forward with dispatch and in a manner consonant with safeguarding those projects from those whom Congress might regard as subversive or potential enemies. Therefore, it is important for Congress to know the methods, nature and extent of communist infiltration of colleges and universities which are or might become engaged in secret defense projects.

## IV

■■■ Appellant's final contention is that the resolution establishing the Committee on Un-American Activities and conferring on it jurisdiction to make investigations is, on its face, contrary to the First and Fifth Amendments to the Constitution of the United States. This very contention has been urged upon this and other courts and has been consistently rejected.[12]

It is urged that a committee of Congress has no constitutional authority to require an answer of a witness as to his political beliefs and associations. In Quinn v. United States, 349 U.S. at pages 160-161, 75 S.Ct. at page 672, the Supreme Court said:

"There can be no doubt as to the power of Congress, by itself or through its committees, to investigate matters and conditions relating to contemplated legislation. This power, deeply rooted in American and English institutions, is indeed co-extensive with the power to legislate. Without the power to investigate—including of course the authority to compel testimony, either through its own processes or through judicial trial—Congress could be seriously handicapped in its efforts to exercise its constitutional function wisely and effectively.

"But the power to investigate, broad as it may be, is also subject to recognized limitations. It cannot be used to inquire into private affairs *unrelated to a valid legislative purpose. * * *"* [Emphasis supplied.]

From this, it appears that if there is a valid legislative purpose, then, as was held in Barsky,[13] Congress can inquire into "private affairs" and, of course, political views and associations. If Congress can legislate against a threat of communism which is reasonably apprehended, it can, consistently with the meaning of the Constitution and the language in the Quinn case quoted above, inquire of a witness whether or not he is a communist, subject to the constitutional limitations imposed by the privilege against self-incrimination.

We said in Barsky:

"* * * We think that inquiry into threats to the existing form of government by extra-constitutional processes of change is a power of

12. Marshall v. United States, 1949, 85 U.S.App.D.C. 184, 176 F.2d 473, certiorari denied, 1950, 339 U.S. 933, 70 S. Ct. 663, 94 L.Ed. 1352; Dennis v. United States, 1949, 84 U.S.App.D.C. 31, 171 F.2d 986, affirmed, 1950, 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734; United States v. Josephson, 2 Cir., 1947, 165 F. 2d 82, certiorari denied, 1948, 333 U.S. 838, 68 S.Ct. 609, 92 L.Ed. 1122; and cases cited notes 5 and 10 supra.

13. Barsky v. United States, note 5 supra.

Congress under its prime obligation to protect for the people that machinery of which it is a part, and inquiry into the desirability vel non of other forms of government is a power of Congress under its mandate to initiate amendments if such become advisable.

\*    \*    \*    \*    \*

"If Congress has power to inquire into the subjects of Communism and the Communist Party, it has power to identify the individuals who believe in Communism and those who belong to the party. The nature and scope of the program and activities depend in large measure upon the character and number of their adherents. Personnel is part of the subject. \* \* \*" 167 F. 2d at page 246.

Appellant asks that we re-evaluate Barsky bearing in mind that the subcommittee record indicates that appellant's participation, if any, in communist groups was confined to the intellectual and ideological realm and was not conspiratorial in nature. We reaffirm Barsky, and see nothing which places appellant beyond the ruling therein.

If the Haldane Club of the Communist Party, to which appellant allegedly belonged, was in fact principally a Marxist study group and, as believed by the subcommittee, an adjunct of the Communist Party, we cannot say that the identity of its members and the extent and nature of their participation were not matters of legitimate concern to the subcommittee under its enabling resolution. Whether the Communist Party embraces not only conspiratorial groups but intellectual discussion groups as well, the relationship between them, the group most prevalent, and the extent to which an individual might participate in the activities of each, whether such groups operate within or are connected with public educational institutions, place the questions asked appellant clearly within the pale of valid inquiry.

Though we, of course, agree that Congress does not have a general power to inquire into political beliefs and associations, it does have that power where the answer to the question posed can be and is regarded by Congress as having value in the exercise of legislative duty. Congress can legislate on the internal security dangers it has declared to have arisen from the activities of the Communist Party in this country. It can and it has.

Our view of the record convinces us that the indictment was in no respect defective; that appellant either communicated or could have communicated all his objections to questions asked him and that the committee indicated his objections were untenable; that, if the committee was motivated in part by a purpose of exposure in calling appellant as a witness, it was also properly motivated by a desire for information which it reasonably believed would be helpful to it in the discharge of its duty to make legislative recommendations; and that the subject matter under investigation was not beyond the scope of permissible congressional inquiry under the committee's enabling resolution, which resolution is within its constitutional powers.

The conclusion dictated is that the judgment appealed from is correct and is therefore

Affirmed.

### Appendix

Hearings Before the House Committee on Un-American Activities, Communist Methods of Infiltration (Education), 83rd Cong., 1st Sess. (1953), pp. 1–3.

Opening Statement of the Chairman, February 25, 1953

"Mr. Davis [the first witness called], it is our understanding that you are a member of the teaching profession. In opening this hearing, it is well to make clear to you and others just what the nature of this investigation is.

"From time to time, the committee has investigated Communists and Communist activities within the entertainment, newspaper, and labor fields, and also

within the professions and the Government. In no instance has the work of the committee taken on the character of an investigation of entertainment organizations, newspapers, labor unions, the professions, or the Government, as such, and it is not now the purpose of this committee to investigate education or educational institutions, as such. The committee will follow its long-established policy of investigating Communists and Communist activities wherever it has substantial evidence of its existence.

"When investigating Communists and Communist activities within certain labor unions, the committee was met with the charge by alarmists and partisans within that field that the committee was a group of Fascists and the enemy of labor, and that the real purpose of the investigation was to destroy labor unions. Similar and equally unfounded charges have been made with regard to this hearing. In pursuing its work within the field of labor, the committee carefully refrained from taking any part in any internal disputes within labor or any disputes between employers and employees and confined its activities to the ascertainment and identification of leaders in the labor unions who were members of the Communist Party and were using their influence to promote the objectives of the Communist Party within the field of labor, and to the character, extent, and objects of their Communist Party activities. The work of the committee in this respect has met with such growing success that many labor unions are now actively engaged in eliminating from positions of influence union officials known to be members of the Communist Party and engaged in Communist activities.

"The purpose of the committee in investigating Communists and Communist activities within the field of education is no greater and no less than its purpose in investigating Communists and Communist activities within the field of labor or any other field.

"The committee is charged by the Congress with the responsibility of investigating the extent, character, and objects of un-American propaganda activities in the United States, the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution and all other questions in relation thereto that would aid Congress in any necessary remedial legislation.

"It has been fully established in testimony before congressional committees and before the courts of our land that the Communist Party of the United States is part of an international conspiracy which is being used as a tool or weapon by a foreign power to promote its own foreign policy and which has for its object the overthrow of the governments of all non-Communist countries, resorting to the use of force and violence, if necessary. This organization cannot live except by the promulgation and diffusion of subversive and un-American propaganda and in the view of this committee every person who remains a member of it is contributing to the ultimate accomplishment of its objectives. Communism and Communist activities cannot be investigated in a vacuum. The investigation must, of necessity, relate to individuals and, therefore, this morning the committee is calling you as a person known by this committee to have been at one time a member of the Communist Party.

"The question is sometimes asked whether it is necessary to call as witnesses those who are no longer members of the Communist Party. It is quite obvious for a number of reasons that the answer should be 'Yes.' Such witnesses add immeasurably to the sum total of the knowledge of the character, extent, and objects of Communist activities. The testimony of former Communist Party members resulted virtually in immobilizing the Communist Party in Hollywood. These witnesses considered it their patriotic duty to answer under oath questions relating to their knowl-

edge of Communist infiltration into the organizations of which they had been members, and to their knowledge of other Communist Party activities. Witnesses from the Screen Writers' Guild, the directors' guilds, labor unions, the legal profession, the medical profession, and other groups have made a great contribution to the defense of their country by disclosing to this committee facts within their knowledge.

"Former Communist Party membership, in the view of the committee, should not be held against an individual whose testimony admitting former Communist Party membership has that character of trustworthiness which convinces one that he has completely and finally terminated his Communist Party membership and has been given in all good faith. It is of great aid in determining who remain in the Communist Party to ascertain who have left it.

"The committee was greatly concerned with the evidence developed in the Hollywood hearings with respect to the type of 'thought control' practiced by the Communist Party upon its members. Screen writers were told how and what they should write. The testimony of Budd Schulberg and Edward Dmytryk demonstrate the point as clearly as laboratory experiments would prove a chemical reaction. The same influence was found to exist in the field of art and music. An objective study of this testimony will lead to the inescapable conclusion that it is the Communist Party which is the enemy of academic freedom.

"The committee is equally concerned with the opportunities that the Communist Party has to wield its influence upon members of the teaching profession and students through Communists who are members of the teaching profession. Therefore, *the objective of this investigation is to ascertain the character, extent and objects of Communist Party activities when such activities are carried on by members of the teaching profession who are subject to the directives and discipline of the Communist Party.*" [Emphasis supplied.]