**UNITED STATES of America**
v.
**Mary KNOWLES.**
**Crim. No. 1211–56.**

United States District Court
District of Columbia.

Jan. 10, 1957.

See also 147 F.Supp. 19.

Oliver Gasch, U. S. Atty., and William Hitz, Asst. U. S. Atty., Washington, D. C., for plaintiff.

Henry Sawyer, III, Philadelphia, Pa., and George H. Goodrich, Washington, D. C., for defendant.

RIZLEY, District Judge.

## Opinion

It is charged by indictment in fifty-eight counts that the defendant, Mary Knowles, in contempt of the lawful powers of Congress, refused to answer certain questions propounded to her by members and counsel of the Subcommittee on Internal Security of the Committee on the Judiciary of the United States Senate while the defendant was under oath and appearing as a witness pursuant to lawful summons issued under the authority of the United States Senate.

The parties to this cause have stipulated that:

"On July 29, 1955, and on September 15, 1955, in Washington, D.C., the defendant appeared before the Subcommittee to Investigate the Ad-

ministration of the Internal Security Act [50 U.S.C.A. § 781 et seq.] and Other Internal Security Laws, of the Committee on the Judiciary of the United States Senate, pursuant to Section 102(1) (k) of the Legislative Reorganization Act of 1946 (60 Stat. 818), and to Senate Resolution 366 of the 81st Congress and 58 of the 84th Congress, and to the Standing Rules of the Senate.

"After the testimony of the defendant, the matter of the alleged contempt of defendant on each above occasion was duly reported to the Senate and was duly certified by it to the United States Attorney."

The enabling resolution, under which the subcommittee was proceeding at the times of the alleged contempts, directed such body, "to make a complete and continuing study and investigation of (1) the administration, operation, and enforcement of the Internal Security Act of 1950; (2) the administration, operation, and enforcement of other laws relating to espionage, sabotage, and the protection of the internal security of the United States; and (3) the extent, nature, and effects of subversive activities in the United States, its Territories and possessions, including, but not limited to, espionage, sabotage, and infiltration by persons who are or may be under the domination of the foreign government or organizations controlling the world Communist movement or any other movement seeking to overthrow the Government of the United States by force or violence."

It is the government's position that the duly authorized subcommittee, while in the lawful exercise of the powers conferred upon it by the pertinent resolutions, above mentioned, caused the defendant to appear before it on the 29th day of July, 1955, and again on the 15th day of September, 1955, to testify upon matters within her personal knowledge, or reasonably believed by the Subcommittee to be within her personal knowledge, which were pertinent to the subjects the Subcommittee had been charged

with the duty of investigating and studying in furtherance of the Congressional responsibilities in such areas of national concern. And, upon appearing before the Subcommittee on July 29th, defendant was asked questions, including the following, which she refused to answer upon being directed and ordered to do so by the presiding officer of the Subcommittee:

"Did you, or do you, know Herbert Philbrick?"

"Was your former husband at one time assistant director and instructor at the Samuel Adams School in Boston?"

"Where were you employed during that period of time?"

"Do you know anything about an organization called the International Workers Order?"

Defendant's refusal to answer the respective questions gave rise to Counts 1 through 4 of the Indictment.

The precise questions which defendant refused to answer pursuant to the specific direction and order of the presiding officer of the Subcommittee on September 15, 1955, need not be set out in full in this opinion [1], it is enough for our purposes to determine that each of the questions, with the exceptions hereinafter noted, either appeared to be pertinent to the matters within the jurisdiction of the Subcommittee on the face of the questions or the government, by independent proof adduced at trial, proved the pertinency of such questions to the matters within the jurisdiction of the Subcommittee.

Defendant seeks to justify her refusal to answer the questions propounded to her, and which she was ordered and directed to answer by the presiding officer of the Subcommittee, upon the grounds that: (1) the questions she refused to answer pertained to her remote private thoughts and affiliations which the First Amendment protects from compulsory disclosure; (2) that she was not apprised of the precise subject under inquiry by the Subcommittee prior to, or at the time of, her appearances before it and was therefore unable to determine the pertinency of the questions asked to the subject under inquiry; (3) that the questions to which she refused to give answers were not pertinent to the inquiry then being conducted by the Subcommittee; and (4) that the purpose of the Subcommittee in calling her to testify was not to elicit information which might aid. legislation, but was merely to punish and chastise her in the public eye. Defendant does not contend that she was summoned in an unlawful manner to appear before the Subcommittee or that the Fifth Amendment justified her refusal to answer the questions asked of her.

██ The defendant is presumed to be innocent of the charges upon which she had been indicted. Such presumption remains with the defendant until the government proves beyond a reasonable doubt that, as to each Count of the Indictment, the defendant, while appearing as a witness before a duly authorized Congressional committee [2], was directed and ordered to answer the interrogatory set out; that the specific question was pertinent to matters within the jurisdiction of the Committee then under investigation; that the investigation was in furtherance of a proper Congressional purpose; and, that the defendant refused to answer such interrogatory when so ordered and directed to do so. Quinn v. United States, 1950, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964; Bowers v. United States, 1953, 92 U.S.App.D.C. 79, 202 F.2d 447.

The regularity of the proceedings creating the Subcommittee, the propriety of Congress inquiring into those matters placed within the jurisdiction of the Committee and Subcommittee by the enabling resolutions, and the lawfulness of the composition of the Subcommittee

---

1. The full text of each question appears in the Appendix.
2. The word "committee" is used in its generic sense to include "subcommittee". Barenblatt v. United States, D.C.Cir., 240 F.2d 875.

before which defendant appeared and testified is stipulated. The transcript of the proceedings before the Subcommittee was introduced without objection. It clearly shows that defendant was asked each of the questions referred to in the Indictment on the dates therein alleged. The record also discloses that as to each of such questions the defendant refused to give any answer after being ordered and directed to do so by the presiding officer of the Subcommittee. The elements of the charged offenses remaining, then, is whether each of the questions to which defendant refused to give answers were pertinent to the subjects within the jurisdiction of the Subcommittee, and, if so, whether the questions were in furtherance of a proper and lawful Congressional purpose, or sought to compel disclosure of private beliefs and affiliations protected by the First Amendment of the Federal Constitution.

When defendant was called before the Subcommittee, it possessed information that she had been an active member of the Communist Party in Boston as late as 1948. It was also known to the Subcommittee that the defendant had been a member of the staff of the Samuel Adams School, in Boston, which had been cited by the Attorney General as subversive. The defendant was known to have been the wife of a known or suspected Communist active in the field of labor organization and education. The information linking defendant with the Communist movement had come, in part, from the prior testimony before the Committee by Herbert Philbrick.

██ It was precisely such subversive activities as defendant was, and is, apparently aware of, that the Subcommittee was charged with the duty of investigating and studying. It is manifest from the government's evidence that the Subcommittee had sufficient grounds to prompt an interrogation of the defendant as to her knowledge of the Communist movement in New England, the individuals known by her to have participated therein during past years and at the time of her appearances, and other aspects of the Communist infiltration into institutions in this country. There were sufficient grounds for the Subcommittee to expect this defendant to be in possession of information concerning the methods of Communist infiltration into educational institutions and the purposes thereof, at least in New England. These matters were clearly embraced within the enabling resolutions which must be viewed to determine the propriety of the examination of defendant. And, the Court finds that the interrogation of defendant was in furtherance of a lawful Congressional purpose to inquire into and study the nature and effects of subversion and infiltration by Communists into this country in aid of legislative policy determinations. Such a purpose is a legitimate and proper subject of Congressional activity, in light of the effect such subversion and infiltration has on national security. Barsky v. United States, 1948, 83 U.S.App.D.C. 127, 167 F.2d 241, certiorari denied 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767.

[5, 6] Having determined that the inquiry of the Subcommittee was concerned with matters within the legislative powers of Congress, and within the specific jurisdiction conferred upon the Subcommittee by the enabling resolutions, the defendant's contention that the First Amendment to the United States Constitution protects her private, personal political beliefs and associations from compulsory disclosure must be rejected, where the requisite pertinency of the specific questions existed. Quinn v. United States, supra; Barenblatt v. United States, D.C.Cir., 240 F.2d 875. Nor can it be said that the defendant's known association and contact with the New England Communists was so far removed in time from the date of her appearances as to render the otherwise proper and pertinent inquiries beyond the legitimate interest, and hence the jurisdiction, of the Subcommittee. Cf. Watkins v. United States, 98 U.S.App. D.C. 190, 233 F.2d 681, certiorari granted 1956, 352 U.S. 822, 77 S.Ct. 62, 1 L.Ed.2d 46.

■ The Court has very carefully considered each of the interrogatories propounded to the defendant, which she refused to answer, in order to determine the pertinency of each specific question to the Subcommittee's authorized area of inquiry, which is delineated by the enabling resolutions. Viewed in light of the information had by the Subcommittee about this defendant and her known contacts with the various elements of the Communist Party in New England, the four questions asked the defendant on July 29, 1955, were clearly pertinent to, and a proper foundation for, an inquiry into the facts known by defendant upon Communism in New England, including its methods of infiltration into educational and labor organizations, the participants in the movement, and the extent and effects of such activities. Each of these spheres of subversive activity are an integral part of the specific area of investigation and study delegated to the Subcommittee, and the questions were highly pertinent to the inquiry then being conducted by the Subcommittee.

■ With the exceptions hereinafter noted, the questions propounded to the defendant on September 15, 1955, which she refused to answer were, and are, either pertinent to the subject under inquiry by the Subcommittee on their face, or else were shown to be pertinent by independent evidence adduced by the Government's witness, J. G. Sourwine, who testified concerning facts had by the Subcommittee at the time of defendant's appearances which rendered such questions pertinent to the subject under inquiry.[3] Cf. Bowers v. United States, 1953, 92 U.S.App.D.C. 79, 202 F.2d 447; United States v. Orman, 3 Cir., 1953, 207 F.2d 148; Sacher v. United States, D.C.Cir., 240 F.2d 46.

The questions which defendant refused to answer, when directed and ordered to do so by the presiding officer of the Subcommittee, set out in Counts 33 through 38, inclusive, dealt with specific names of individuals, real and fictitious, whose connection or association with the subject under inquiry does not appear from the face of the questions. The government's witness was unable to recall any precise information which the Subcommittee had in its possession at the time in question that would render these names, and consequently the questions, pertinent to the subject of the Subcommittee's inquiry. The burden of proving the pertinency of these questions was therefore not met by the Government, and such Counts will be dismissed.

■ The defendant's contention that she was not apprised of the subject of inquiry prior to, or at the time of, her appearances is urged on the apparent supposition that the Subcommittee was required to proceed in the execution of its duties by a series of inquiries on precise topics embraced within the express subject matter delegated to it by the enabling resolutions. That is to say, defendant seems to urge that the Subcommittee was required to limit the scope of a given hearing to a categorical subject such as the nature, extent and effects of infiltration into educational institutions, labor organizations or some such precise area of Communist activity. The investigative powers of the Subcommittee cannot be thus restricted. The authority of the Subcommittee is measured by only one criterion; that is, the enabling resolutions creating it and charging it with specific duties.

The defendant was, in any event, fully aware of the purpose and scope of the Subcommittee's inquiry, in connection with which she appeared and testified. This is indicated by her statements on July 29, 1955, that:

"On this matter of acquaintances or nonacquaintances, or anything to do with Communist affiliations or nonaffiliations, I would like to tell the committee here what I have told

3. Mr. Sourwine was Chief Counsel for the Subcommittee at the time of defendant's appearances before it.

my employers at the Plymouth Meeting Library Committee, that for many years now I have had no connection, formal, or any other way, with any organization that would be either on the Attorney General's list or would be a so-called subversive organization or left-wing organization. And, I think that any other questions, including this question here would, in my opinion, and upon the advice of counsel, be beyond what I understand to be the jurisdiction of this committee and of its resolutions. And so I choose not to answer." Senate Report No. 1765, supra. p. 6.

"The reason I feel that I cannot answer this question about Herbert Philbrick is that I think it invades constitutional rights as under the first amendment, and I feel even more strongly that these questions have no pertinency to the question of national security at the moment, and any relationships or nonrelationships are not valid points of inquiry at this time." Senate Report No. 1765, supra. p. 7.

And, by her further statement on September 15, 1955, that:

"I would like at this time—tell me if you can hear this—I would like at this time to say that this is the third time that I have been called to Washington, and that on this occasion, as on the other occasions, I have the same thing to say: First, that I am not a Communist; that I am not a member of the Communist Party, and that for many, many years I have had no connection, direct or indirect, with any organization on the Attorney General's list.

"Further than that I have no knowledge of any matters concerning national security; I have no knowledge of any matters concerning the Internal Security Act of 1950; I have no knowledge of any matters of subversion, sabotage, or espionage, of infiltration, of violent overthrow of the Government, of any acts concerning any foreign powers or any other illegal act.

"In view of these things and the fact that I am a private citizen employed in a private institution under the care of a religious organization, I feel that I have no information that would be within the power or the jurisdiction of this duly organized committee to ask of me." Senate Report No. 1765, supra, pp. 12–13.

It thus appears quite forcefully from the testimony of the defendant before the Subcommittee that she was fully apprised at such time of the scope of the Subcommittee's authority and the subject under inquiry. It is equally clear that her refusals to answer proper questions asked of her by the Subcommittee did not result from anything other than her defiant stand that the Subcommittee lacked jurisdiction to inquire of her concerning those very matters the Subcommittee had been lawfully directed to inquire into and study.

 The evidence introduced by the government establishes beyond any reasonable doubt that the defendant was summoned and interrogated upon a reasonable belief that she possessed information highly pertinent to the subject which the Subcommittee was created to investigate and study. The evidence of the defendant which seeks to show that the Subcommittee had an improper or unlawful purpose in calling her to testify falls far short of establishing such allegation, and is wholly insufficient to rebut the government's evidence which shows a proper purpose for defendant's appearances before the Subcommittee. There is nothing in this record which indicates that any member of the Subcommittee was in any manner concerned with the defendant's private status, beliefs, or associations, except insofar as such matters were of apparent relevancy to the area of investigation and study committed to the Subcommittee. There is nothing in this record to indicate that the established and proper purpose for

requiring defendant to appear before the Subcommittee was subverted by a latent purpose to subject her to punishment, humiliation or embarrassment by compelling her to testify to facts and circumstances already known by the Subcommittee.

The evidence adduced in this case establishes beyond any reasonable doubt that the defendant is guilty as charged in Counts 1 through 32, inclusive, and guilty as charged in Counts 39 through 58, inclusive. Counts 33 through 38 will be dismissed.

The cause will be referred to the Probation Officer for investigation and report. The bond in amount of $500 heretofore set will be continued pending sentence. The defendant and counsel will be notified of the sentence date upon receipt by the Court of the Probation Officer's report.

## Appendix

United States District Court for the District of Columbia

Holding a Criminal Term

Grand Jury Impanelled on August 30, 1956, Sworn in on September 4, 1956

United States of America : Criminal No. 1211–56
 : Grand Jury Original
v.
Mary Knowles : 2 U.S.C. 192

The Grand Jury charges:

### Introduction

On July 29, 1955, and on September 15, 1955, in the District of Columbia, the Subcommittee to Investigate the Administration of the Internal Security Act and Other Internal Security Laws, of the Committee on the Judiciary of the United States Senate, was conducting hearings, pursuant to the Legislative Reorganization Act of 1946, Section 102(1) (k), (60 Stat. 818), and to Senate Resolutions 366 of the 81st Congress and 58 of the 84th Congress, and to the Standing Rules of the Senate.

Defendant, Mary Knowles, appeared as a witness before that subcommittee, at the place and on the dates above stated, and was asked questions which were pertinent to the question then under inquiry. Then and there the defendant unlawfully refused to answer those pertinent questions.

The allegations of this introduction are adopted and incorporated into the counts of this indictment which follow, each of which counts will in addition designate the particular date and describe the question which was asked of the defendant and which she refused to answer.

### Count One

On July 29, 1955:

"Did you, or do you, know Herbert Philbrick?"

### Count Two

On July 29, 1955:

"Was your former husband at one time assistant director and instructor at the Samuel Adams School in Boston?"

### Count Three

On July 29, 1955:

"Where were you employed during that period of time?"

### Count Four

On July 29, 1955:

"Do you know anything about an organization called the International Workers Order?"

### Count Five

On September 15, 1955:

"Then I want to ask you whether or not you have ever been a member of the Communist Party."

### Count Six

On September 15, 1955:

"Who was the friend with whom you moved [to Wayne, Pa.]?"

### Count Seven

On September 15, 1955:

"Was your former husband, Clive Dorman Knowles, to your knowledge, active in Communist Party matters?"

## Count Eight

On September 15, 1955:

"Now, was your former husband, Clive Dorman Knowles, assistant director and an instructor at the Samuel Adams School in Boston?"

## Count Nine

On September 15, 1955:

"Mrs. Knowles, do you know anything about an organization called the International Workers Order?"

## Count Ten

On September 15, 1955:

"Mrs. Knowles, as a matter of fact, you know that you belonged to the International Workers Order, did you not, Lodge 503J, Brookline, Mass.?"

## Count Eleven

On September 15, 1955:

"When was it that you joined the International Workers Order?"

## Count Twelve

On September 15, 1955:

"As a matter of fact, as already indicated, you joined in 1947; isn't that true?"

## Count Thirteen

On September 15, 1955:

"Did you know, Mrs. Knowles, that the Joint Anti-Fascist Refugee Committee had been cited as subversive and Communist by Attorney General Tom Clark in 1947 and in 1948?"

## Count Fourteen

On September 15, 1955:

"Did you know that the Joint Anti-Fascist Refugee Committee had been cited as a Communist-front organization by the Special Committee on Un-American Activities in 1944?"

## Count Fifteen

On September 15, 1955:

"Did you know that, as a matter of fact, the Joint Anti-Fascist Refugee Committee was a Communist-front organization?"

## Count Sixteen

On September 15, 1955:

"Were you ever employed in any capacity as a secretary in the Samuel Adams School?"

## Count Seventeen

On September 15, 1955:

"Is it not true that you were not merely a secretary of the Samuel Adams School, but that you were the secretary of the Samuel Adams School, and that there were times when you were in complete charge of the school?"

## Count Eighteen

On September 15, 1955:

"You have been quoted publicly as having said you commenced employment with the Samuel Adams School in 1945; is that true?"

## Count Nineteen

On September 15, 1955:

"Are you familiar with the nature, aims, and purposes of the Communist Political Association, an association now no longer in existence?"

## Count Twenty

On September 15, 1955:

"Did you or do you know Ann Burlak?"

## Count Twenty-one

On September 15, 1955:

"Did you or do you know Daniel Boone Schirmer?"

## Count Twenty-two

On September 15, 1955:

"Well, you knew Manny Bloom was active in the Communist Party in Massachusetts, didn't you?"

## Count Twenty-three

On September 15, 1955:

"Do you or did you know Jacqueline Steiner?"

## Count Twenty-four

On September 15, 1955:

"You knew that Jacqueline Steiner was a member with you of the Profes-

sional Club of the Communist Party, did you not?"

### Count Twenty-five

On September 15, 1955:

"You know that Herbert Philbrick testified, has testified, to that, do you not?"

### Count Twenty-six

On September 15, 1955:

"As a matter of fact, didn't you know Harry Winner as a member of the educational section of the Communist Party and director of the Samuel Adams School?"

### Count Twenty-seven

On September 15, 1955:

"As a matter of fact, didn't you live at Harry Winner's residence at Malden, Mass., and isn't that why you refuse to tell us where you lived at Malden?"

### Count Twenty-eight

On September 15, 1955:

"Did you or do you know a lady whom you called Jan?"

### Count Twenty-nine

On September 15, 1955:

"Do you know Janet Faxon?"

### Count Thirty

On September 15, 1955:

"Do you or did you know Helen Dean Markham and her husband, George Markham?"

### Count Thirty-one

On September 15, 1955:

"Now, as a matter of fact, he [Harrison Harley] was director of the Samuel Adams School, and you were for a time his secretary; isn't that right?"

### Count Thirty-two

On September 15, 1955:

"Do you or did you know William Harrison, vice president of the Communist Party, and a member of the board of trustees of the Samuel Adams School?"

### Count Thirty-three

On September 15, 1955:

"Do you or did you know Otis Archer Hood?"

### Count Thirty-four

On September 15, 1955:

"Did you or do you know an Edith Abber?"

### Count Thirty-five

On September 15, 1955:

"Do you or did you know Barbara Rosenkranz?"

### Count Thirty-six

On September 15, 1955:

"Did you or do you know a man named Franklin P. Collier, Jr.?"

### Count Thirty-seven

On September 15, 1955:

"Did you know a man named Herbert I. Zimmerman?"

### Count Thirty-eight

On September 15, 1955:

"Do you or did you know a man named Julius Dolendorfer?"

### Count Thirty-nine

On September 15, 1955:

"Did you know, Mrs. Knowles, that the Samuel Adams School had been cited by the Attorney General in December 1947 as an adjunct of the Communist Party?"

### Count Forty

On September 15, 1955:

"Do you understand now, Mrs. Knowles after I have told you of that citation, and by reason of other matters that have come to your knowledge, that the Samuel Adams School is believed to have been Communist-influenced?"

### Count Forty-one

On September 15, 1955:

"I would like to ask the witness if she ever saw the document, of which this is a photostat [catalogue, Samuel Adams School, summer courses, 1947]."

### Count Forty-two

On September 15, 1955:

"Well, then, I will go back to my earlier question: Isn't it true that your refusal to answer these questions is concealing from this committee and keeping out of our record matters within your knowledge concerning the Communist conspiracy against the Government of the United States?"

### Count Forty-three

On September 15, 1955:

"Were you a member of the Communist Party yesterday?"

### Count Forty-four

On September 15, 1955:

"Were you, Mrs. Knowles, ever connected with district No. 1 of the Communist Party in Boston, Mass.?"

### Count Forty-five

On September 15, 1955:

"Were you, to your knowledge, carried on the rolls of the Communist Party of New England?"

### Count Forty-six

On September 15, 1955:

"Were you secretary of the school branch of the Communist Party of New England?"

### Count Forty-seven

On September 15, 1955:

"As a matter of fact, don't you know of your own knowledge that in February of 1947 you were carried on the rolls of the Communist Party of New England as secretary of the school branch?"

### Count Forty-eight

On September 15, 1955:

"Did you ever register as a member of the Communist Party?"

### Count Forty-nine

On September 15, 1955:

"Do you know what I mean by the 'Pro group of the Communist Party' in Boston?"

### Count Fifty

On September 15, 1955:

"Were you a member of the council of the Pro group of the Communist Party of Boston?"

### Count Fifty-one

On September 15, 1955:

"Were you ever a member of the Communist Political Association?"

### Count Fifty-two

On September 15, 1955:

"As a matter of fact, you were an active member of the Roxbury Club of the Communist Political Association in 1944; were you not?"

### Count Fifty-three

On September 15, 1955:

"Do you or did you know Florence Williams?"

### Count Fifty-four

On September 15, 1955:

"As a matter of fact, didn't you know Florence Williams as an official of the Roxbury Club of the Communist Political Association?"

### Count Fifty-five

On September 15, 1955:

"Have you seen Florence Williams during the past year?"

### Count Fifty-six

On September 15, 1955:

"Were you ever a member of the Jamaica Plain branch of the Communist Political Association?"

### Count Fifty-seven

On September 15, 1955:

"Did you, Mrs. Knowles, withdraw your official connection with the Communist Party after Herbert Philbrick had publicly stated that he knew you as a participant in the Communist conspiracy against the United States?"

### Count Fifty-eight

On September 15, 1955:

"Have you, Mrs. Knowles, during the present year, 1955, conferred with persons known to you to be Communists?"