UNITED STATES of America ex rel. Bruce S. BERRY and Richard S. Gore, Petitioners,

v.

Thomas J. MONAHAN, Director, Cook County Department of Corrections and Neil F. Hartigan, Attorney General of the State of Illinois, Respondents.

No. 87 C 1328.

United States District Court, N.D. Illinois, E.D.

Feb. 8, 1988.

Robert M. Stephenson, James R. Streicker, Margaret L. Paris, William J. Martin, Cotsirilos & Crowley, Ltd., Chicago, Ill., for petitioners.

Mark Rotert, Asst. Atty. Gen., Crim. Appeals Div., Chicago, Ill., for respondents.

## MEMORANDUM OPINION AND ORDER

ANN C. WILLIAMS, District Judge.

Pursuant to 28 U.S.C. § 2254, Bruce Berry and Richard Gore petition this court for a writ of habeas corpus liberating them from a three-month sentence imposed by the Illinois Supreme Court for direct criminal contempt of court. The novel issue presented by this case is whether a court, in the face of an individual's refusal to comply with a court order on the basis of the fifth amendment privilege against self-incrimination, can simultaneously find that the privilege was erroneously invoked and impose criminal-contempt sanctions. This court concludes that the Constitution prohibits such a procedure and consequently issues the writ.

I

*Factual Background*[1]

In early 1985, the petitioners were members of the Illinois bar and the sole lawyers

---

1. According to Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Court, the court must make a determination of whether an evidentiary hearing is necessary to resolve the issues raised by the habeas corpus petition. The court deemed admitted any factu-

in the firm "Berry and Gore, Ltd." Considering that the firm only employed two lawyers, its predominantly personal-injury caseload was immense—in early 1985 over 6,000 pending cases. Based on allegations of fraud and misappropriation of client funds, the Attorney Registration and Disciplinary Commission of Illinois ("ARDC") was at that time conducting an investigation of the petitioners pursuant to Illinois Supreme Court Rule 752 for conduct "which tend[ed] to defeat the administration of justice or to bring the courts or the legal profession into disrepute." *See* Ill. Rev.Stat. ch. 110A, par. 752. After extensive negotiations between the Administrator of the ARDC and the petitioners, the parties agreed in February, 1985 to the conditions under which the petitioners could withdraw from the practice of law; specifically, the petitioners had to notify their clients of the petitioners' decision to leave the practice of law and would be subject to certain monitoring procedures of the ARDC.

Subsequently, on February 26, 1985, the petitioners moved pursuant to Illinois Supreme Court Rule 762 to strike their names from the roll of attorneys licensed to practice law in Illinois. *Id.* par. 762. In the motion, the petitioners requested a reasonable amount of time to take the steps necessary to insure that their clients continued to have effective representation. The petitioners stated in the motion that they would abide by the conditions imposed by their agreement with the ARDC if the Court granted the motion. The Administrator stated in response that the ARDC had no objection to the motion. Nevertheless, the Illinois Supreme Court without explanation denied the motion on March 12, 1985.

Thereafter the petitioners prepared and mailed to their clients a form letter dated March 15, 1985. In the letter the petitioners informed their clients that the petitioners had decided to retire and that their clients had to make arrangements for different representation. The petitioners further stated in the letter that their clients could contact Alan Katz, a lawyer "of counsel" to the petitioners' firm. Shortly after mailing the form letters, the petitioners learned that they were the target of a federal grand-jury investigation. Specifically, the ARDC advised the petitioners that on or about March 13, 1985 the ARDC had received a grand-jury subpoena calling for production of the ARDC's investigative file relating to the petitioners' case. Moreover, the petitioners themselves on or about April 4, 1985 received a federal grand-jury subpoena calling for the books, records or documents of the petitioners' firm.

In late April of 1985,[2] the petitioners filed with the Illinois Supreme Court a renewed motion to strike their names from the roll. In their renewed motion, the petitioners stated that they had retired from the practice of law, transferred the physical assets of their firm to Katz, removed their names from their former law offices, and sent their clients a letter of notification (attached to the renewed motion and already described by this court). In response, the Administrator filed a document requesting "that the Court allow the motion of respondents that they be disbarred on consent or, in the alternative, that the Court suspend respondents pursuant to Rule 774 pending disposition of a federal investigation and/or disciplinary proceedings under such terms and conditions as the Court may deem appropriate."[3] After the petitioners filed their renewed motion to strike, they learned that they were also the focus of a state grand-jury investigation and that a Cook County grand-jury had served the ARDC with a subpoena on or around May 6, 1985 ordering production of Berry and Gore, Ltd. records.

al statement made in the memoranda not expressly contested by the opposing party and concluded from the parties' memoranda that no hearing was necessary.

**2.** The petitioners say April 23, the respondents April 19.

**3.** "Rule 774" refers to Illinois Supreme Court Rule 774, Ill.Rev.Stat. ch. 110A, par. 774. The petitioners in the instant proceeding were the "respondents" in the disciplinary proceeding.

On June 12, 1985 the Illinois Supreme Court entered an order which stated that the Court reserved ruling on the renewed motion to strike and ordered that the petitioners be suspended from the practice of law pursuant to Illinois Supreme Court Rule 774. As for the conditions of the suspension, the June 12, 1985 Order provided, in pertinent part, as follows:

IT IS FURTHER ORDERED That the following conditions be imposed on this interim suspension:

(1) The respondents shall, within 21 days from the date hereof, notify all those who were clients of said respondents or either of them as of February 26, 1985, of their interim suspension from the practice of law. The wording of the letter to be sent to said clients shall be submitted by the respondents to the Administrator of the Attorney Registration and Disciplinary Commission for approval prior to mailing. Said letter shall be mailed in the manner provided by Rule 764, and as provided in said rule, the respondents, within 35 days from the date of this order, shall file with the clerk of this court an affidavit, together with the proof of service, of a copy thereof upon the administrator stating that they have fully complied with the provision of this condition. The affidavit shall contain such further information as is required by Rule 764.

(2) Also, within 35 days from the entry of this order, respondents shall provide to the administrator:

(a) An inventory of all pending matters for which the respondents, or any attorney in their employ under their supervision, or associated with them, were responsible as of February 26, 1985. As to each matter, the inventory shall include:

(1) The office file number, if any, assigned to the matter;

(2) The name and address of client or clients;

(3) If suit has been filed, the court in which filed and the caption, and the court file number of said case;

(4) The disposition of the matter, if any, since February 26, 1985, stating whether the disposition was by judgment, or by settlement, and the amount thereof, or whether the file was returned to the client, or transferred to another attorney; and

(5) The name and address of any attorney to whom the matter has been transferred, assigned or referred.

(b) Copies of all records relating to the transfer of assets to Allen Michael Katz referred to in respondents' renewed motion to strike name from role of attorneys filed in this court on April 22, 1985. . . .

On July 8, 1985 the petitioners filed a motion to reconsider and modify the June 12, 1985 Order. The petitioners' in their motion to reconsider made a number of factual and legal arguments, one of which was refusal to comply with the June 12, 1985 Order based on their fifth amendment privilege against self-incrimination. Specifically, the petitioners asserted their fifth amendment privilege by stating as follows:

Paragraph No. 2(a) on Page 3 of the Court's Order requires movants to prepare an "inventory of all pending matters for which the [movants], or any attorney in their employ under their supervision, or associated with them, were responsible as of February 16, 1985." As the Court has been advised by the Administrator, movants are currently the subject of federal and state grand jury investigations into their conduct as attorneys in their representation of clients, as reflected in media coverage arising out of these proceedings. To require movants to prepare an inventory which could subsequently be used as evidence against them in a criminal proceeding, or to require them to send notification to clients, the representation of whom is the subject of criminal investigations, is to compel them to engage in acts of testimonial self-incrimination. *See, e.g., United States v. Doe*, [465] U.S. [605], 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984). Movants hereby invoke their constitutional right against self-incrimination and respectfully decline to comply with the terms of

the Court's Order set forth in Paragraph Nos. 1 and 2(a).

According to affidavits filed by the petitioners in this proceeding, the petitioners' decision to assert their fifth amendment privilege had been made in part based upon the advice of their counsel William Martin, James Streicker, Patrick Tuite and others.

On July 15, 1985 the Illinois Supreme Court ordered the petitioners to show cause why they should not be held in contempt. The Rule to Show Cause referred to petitioners' refusal to comply with the June 12, 1985 Order, but it did not mention the petitioners' invocation of the fifth amendment nor specify whether the hearing on the Rule to Show Cause, scheduled for August 13, 1985, would concern civil or criminal contempt.[4]

Pursuant to the Rule to Show Cause, the Illinois Supreme Court convened in Chicago, Illinois on August 13, 1985. The hearing consisted of short statements by counsel on behalf of the parties involved followed by questioning of counsel by members of the Court. Deputy Administrator John O'Malley appeared on behalf of the ARDC, William Martin on behalf of the petitioners. For purposes of this proceeding,[5] the relevant portion of the hearing began as follows:

> JUSTICE: What type of proceeding do you perceive this to be? Is that a criminal contempt or a civil contempt proceeding?
>
> MR. O'MALLEY: I hesitate to answer that question without having thought about it in detail, because this is a civil proceeding relating to the processes of and in the Court's Order. Other than that, it's civil in nature having to do with compliance of the Order.

Transcript ("Tr.") at 64. Martin in his short statement opened by also saying that his perception of the hearing was that the hearing "involve[d] civil contempt." Tr. at 65. At no point in the hearing did either the parties or the Court ever refer to the hearing's purpose as relating to criminal contempt.

Martin, in his short statement and in response to questions, also detailed the petitioners' fifth amendment concerns. He began by stating that the petitioners had not intended any disrespect of the Court's June 12, 1985 Order by refusing to comply. Instead, he explained, a federal grand jury was then investigating the manner in which the petitioners practiced law and the petitioners were concerned that compliance with the terms of the June 12, 1985 Order would mean incriminating themselves. Tr. at 66. Specifically, Martin stated that because a potential prosecution would have to establish that the petitioners had represented certain individuals and the details about that representation, the order compelling the petitioners to write the client letter and provide an inventory with client information to the ARDC implicated the fifth amendment. Tr. at 69. According to Martin, the Court did not have the ordered inventory in their hands because of a good-faith invocation of the fifth amendment and there had "been no judicial determination that that fifth amendment claim is not valid." Tr. at 68. Martin added:

> There has been no judicial determination whatsoever regarding the invocation of the fifth amendment claim and based upon the jeopardy that these gentlemen are in with respect to a federal prosecution, it's my view that it's essential that there be a clear judicial decision as to whether or not they have properly invoked the fifth amendment.

*Ibid.*

Despite Martin's repeated references to the importance of a resolution of the petitioners' fifth amendment objection, the Court did not reach the merits of that objection at the August 13, 1985 hearing.

---

**4.** If the purpose of the relief is to compel the contemner to comply or to compensate another for the contemner's refusal, the contempt proceeding is civil. If the purpose is to punish the contemner and vindicate the court, the proceeding is criminal. *United States v. Asay,* 614 F.2d 655, 659 (9th Cir.1980).

**5.** The transcript of the August 13, 1985 hearing is forty-five pages long; consequently this court concluded that only portions directly relevant to the Illinois Supreme Court's decision could be included.

The Court expressed concern that the petitioners' former clients could not make an informed decision about future representation by Katz without knowing that the petitioners had left the practice of law under "cloud." Tr. at 76. The Court also commented that a number of those clients might not even be aware that the petitioners no longer practiced. Tr. at 70. In proposing ways to address these concerns, the Court asked Martin and O'Malley whether the ARDC or Katz could write the necessary letter to the petitioners' clients, see Tr. at 74, 78, or whether the Court could compel the entity Berry and Gore, Ltd. to produce the inventory. Tr. at 94–95. In the course of a brief interchange with Martin, Justice Ryan said that he found Martin's fifth amendment arguments "hard to accept." Tr. at 79–80. But it is apparent from the transcript that Justice Ryan intended that comment only to be a part of the oral argument on the fifth amendment objection, not a definitive ruling by the Court.

Toward the end of the hearing, Justice Ryan asked Martin whether it was still the petitioners' position that they would not comply with the June 12, 1985 Order. Martin responded, "I believe a fair statement of their position ... is that they seek a judicial determination of whether or not their invocation of the fifth amendment is proper." Tr. at 86. Martin suggested that, in order for the Court to determine the validity of the invocation, the Court follow the procedures it established in In re Zisook, 88 Ill.2d 321, 58 Ill.Dec. 786, 430 N.E.2d 1037 (1981), cert. denied, 457 U.S. 1134, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982).[6] Tr. at 86–87. Martin raised the petitioners' invocation of the fifth amendment again at the end of the hearing just before the Court stated that it would take the matter under advisement and adjourned. Tr. at 102. On that same date after the hearing the Court entered the following order:

This cause having come for hearing upon the rule to show cause that was issued on July 15, 1985, against respondents for their refusal to comply with the order of June 12, 1985, and the Court having heard arguments by counsel for the Administrator and the respondents;

IT IS ORDERED that this case is referred to the Chief Judge of the Circuit Court of Cook County to designate a judge to hear the matter and take evidence, on an expedited basis, so that this court may determine whether the respondents have asserted a valid fifth amendment claim. See In re Zisook (1981), 88 Ill.2d 321, 333–334 [58 Ill.Dec. 786, 791–92, 430 N.E.2d 1037, 1042–43 (1981)]. The transcript of said hearing together with any exhibits shall be filed with the Clerk of this court without delay.

Pursuant to the August 13, 1985 Order, the Chief Judge assigned the matter to Cook County Circuit Judge Martin Brodkin. Judge Brodkin conducted the Zisook hearing on October 23, 1985. After reviewing the parties' stipulation and hearing argument, Judge Brodkin stated that he believed Zisook imposed on him an obligation to make a ruling, and that his conclusion was that the petitioners had asserted a valid fifth amendment claim. Specifically, Judge Brodkin stated as follows:

Well, my own opinion—and that's only my opinion—the Supreme Court may not agree with me—is particularly as to paragraph one asking that he send that letter out admitting those clients, those files, are his could possibly constitute a violation of his fifth amendment rights because there may be one, two, five, ten,

---

**6.** In Zisook, three attorneys under investigation by the ARDC refused to testify and, in certain instances, to produce documents based on the fifth amendment. The Illinois Supreme Court stated "that in attorney disciplinary hearings it is inappropriate to vest complete discretion in the witness in applying the privilege against self-incrimination. Rather, the issue must ultimately be resolved by the court." In re Zisook, 88 Ill.2d 321, 58 Ill.Dec. 786, 791, 430 N.E.2d 1037, 1042 (1981), cert. denied, 457 U.S. 1134, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982). The Court adopted a procedure whereby the "ARDC requests a judicial determination from the chief judge of the circuit in which the proceeding is being conducted, who will then designate a judge to hear the matter. The witness shall appear before the designated judge, who will then determine whether the assertion of the privilege was justified." Ibid.

maybe any number of those files where he says "I didn't handle them, somebody else handled them, they weren't mine, I didn't have anything to do with them." Of course, that's only an assertion. That doesn't mean that it's true.

If there's any doubt at all, that the right of the Respondent to assert his fifth amendment claim should be in my opinion from what I have read overriding and is a lot stronger than that of those who are asserting that fifth amendment rights are not valid assertion.

As far as making a list, I don't know. It seems to me that there is a possibility that a person's fifth amendment right would be violated. That's my opinion. May not be the Supreme Court's opinion and certainly they're not going to stretch anything to support me. So I just don't know whether they want my opinion or not. The *Zisook* case says they want my opinion.

\* \* \* \* \* \*

But in this case I think that there is a valid ground for asserting a fifth amendment claim. Paragraph 1, paragraph 2 were doubtful but I believe there might be a valid doubt. There might be a valid assertion of the fifth amendment claim. We stretched that right. It's a very precious right. It's a very basic right in our Constitution. And it's a very important right and I think it's stated in *Zisook* that we should find in favor whenever we can in favor of the person asserting that right, whenever there's any real doubts in our minds whether should or should not, whether it is or is not a valid assertion.

I'm sure the Supreme Court will do as they see fit, but that's my opinion and I'm trying to comply with the *Zisook* case. As long as you made your complete argument, the Supreme Court will read the transcript and will make up their own minds and their own opinion. I would like to offer them my assistance but I don't think they're going to ask for it.

Tr. at 38–40.

On March 27, 1986, the Illinois Supreme Court issued a short order denying the petitioners' renewed motion to strike (pending since April of 1985) and set a second hearing date for the Rule to Show Cause—April 18, 1986. In response to written questions by the ARDC, the Court by letter dated April 16, 1986 stated that the parties should be prepared to argue both criminal and civil contempt at the April 18, 1986 hearing and that Judge Brodkin's oral ruling was not binding on the Court.

At the April 18, 1986 hearing, Tuite and Martin appeared on behalf of the petitioners, O'Malley on behalf of the ARDC. O'Malley began his argument as follows:

> The factual premise of this case is that Respondents Berry and Gore have directly declined in pleadings filed before this Court, to comply with the order of this Court. They did so on the basis of the privilege against self-incrimination.
>
> The issues of the case are rather that the claim of privilege against self-incrimination is valid and if not, whether their refusal to comply with the order obstructs the Court's ability to administer justice.

Tr. at 6. Most of O'Malley's argument focused on the merits of the petitioners' fifth amendment claim. O'Malley asserted that the petitioners had waived their fifth amendment privilege when they had mailed to their clients a letter announcing their retirement. Tr. at 9. He further argued that the petitioners had waived their privilege when they filed their renewed motion to strike without asserting the privilege even though they knew they were under investigation. Tr. at 13. Finally, O'Malley cited the fact that the petitioners had a relationship with Katz pursuant to which they received a percentage of the compensation earned by Katz for work done for the petitioners' former clients. O'Malley maintained that by accepting such fees, the petitioners had waived their privilege. Tr. at 16. O'Malley concluded:

> In the absence of a valid claim of the privilege, we suggest there is no question that their refusal to comply with the Court's order is direct contempt of the June 12th order. That order was an

appropriate exercise of the Court's power; it followed many arguments where the Court expressed concern about this transfer and about the interests of the clients and was an attempt by the Court to intervene, prevent misinformation and protect the clients. Their refusal was direct. It is contained in the pleadings filed before the Court. The Court need not refer to any other evidence to determine whether they refused to comply.

We believe the Respondents are guilty of direct and criminal contempt of this Court. The effect was to obstruct this Court's ability to get correct information to the clients and to preserve and enhance the benefit to Berry and Gore. We request that the Court find that the privilege against self-incrimination was not validly asserted in this case; that Respondents are each guilty of contempt of this Court; that the Court impose such sanction as it deems reasonable for lawyers of law and that Berry and Gore be required to pay the costs of this proceeding.

Tr. at 18–19.

Tuite began his response by asserting that the Court could not find the petitioners in contempt until the Court ruled on the merits of the petitioners' invocation of the fifth amendment and (if the Court found the invocation inappropriate) then ask the petitioners if they still refused to comply with the June 12, 1985 Order. Tr. at 19–20. Tuite stated that his understanding of the law was that his clients could invoke the privilege when compelled to provide an answer even though they had previously answered a similar question voluntarily. Tr. at 23. According to Tuite, the petitioners could invoke the fifth amendment because the June 12, 1985 Order required creation of a new document by the petitioners, not mere production of an old one. Tr. at 32. Tuite reiterated at the end of his argument the need for resolution of the threshold issue—the fifth amendment issue—before the contempt proceedings could go forward. Tr. at 40–41. The Court again took the matter under advisement.

Another eight months passed before the Illinois Supreme Court ruled. On December 12, 1985, the Court entered an order which both rejected the petitioners' fifth amendment claim and found the petitioners to be in contempt. In pertinent part, the Court in its December 12, 1985 Order stated as follows:

In refusing to comply with this court's order of June 12, 1985, respondents have invoked their constitutional right against self-incrimination. The court, having fully considered the arguments of respondents and the Administrator on the fifth amendment issue, finds that any privilege that may have attached to the names and files of clients was abandoned and waived when the files were turned over to Attorney Alan Michael Katz and when respondents sent their letter of March 15, 1985, to their clients informing them that they had retired from the practice of law. The court further finds that the records which were the subject of said June 12, 1985 order were required to be kept by the respondents because of the nature of their professional practice.

This court notes that the respondents' unjustified recalcitrance has impeded the administration of justice with prejudice to the public at large, and has caused great expense to the Administrator as well as to the various public officials involved as a result of investigations and proceedings related to respondents.

IT IS THEREFORE ORDERED that the rule to show cause is enforced and respondents, Bruce Stephen Berry and Richard Stuart Gore, are hereby held in contempt of court for failing to comply with the order of June 12, 1985, and are ordered to appear before the court in Springfield on Tuesday, January 20, 1987, at 9:30 a.m., for sentencing.

On January 9, 1987, the petitioners filed a motion to vacate and clarify the December 17, 1986 Order. The petitioners in their motion complained that they had asserted their fifth amendment privilege in good faith and that there had been no contrary judicial determination until the December 17, 1986 Order. Because the Court simultaneously rejected the petitioners' fifth

amendment claim *and* found them in contempt, the Court had never afforded the petitioners the opportunity to comply with the June 12, 1985 Order at a time when the petitioners knew that the Court had rejected their fifth amendment claim. The petitioners stated in their motion of January 9, 1987 that they would comply. The petitioners also complained that the December 17, 1986 order was silent on the nature of the contempt and, if the contempt was criminal, that they were entitled to a jury trial. In response, the Court entered an order on January 21, 1987 stating that the petitioners would be sentenced for "direct criminal contempt of court."

On January 23, 1987, the Illinois Supreme Court, after a hearing, sentenced the petitioners to three months in jail for direct criminal contempt. On January 27, 1987, the Court in its sentencing order denied the petitioners' motion to vacate the contempt order because the Court found that their attempt at compliance had come too late. Specifically, the January 27, 1987 Order stated as follows:

Following this court's contempt order entered December 17, 1986, respondents tendered to this court a proposed client notification letter purportedly to comply with this court's order of June 12, 1985. During oral argument at the contempt sentencing hearing before this court on January 23, 1987, counsel for respondents stated that respondents were not required to comply with the order of June 12, 1985, until a fifth amendment claim which they had interposed had been ruled invalid. For the asserted purpose of purging themselves of the contempt of which they were adjudged on December 17, 1986, the respondents on January 13, 1987, tendered the proposed client notification letter and offered to provide an inventory of client matters. The respondents' action comes too late for the reason that the intent of the order of June 12, 1985, was that the respondents' clients be fully notified of respondents' suspension from the practice of law in order that the clients be in a position to take action to protect their interests. Because of respondents' contumacious disregard of the order it became necessary that other action be directed by this court.

Specifically, following the respondents' refusal to comply with the order of June 12, 1985, in order to protect the interests of respondents' clients, this court directed the Attorney Registration and Disciplinary Commission and the circuit court of Cook County to search the records of the circuit court of Cook County, and other available files, to assure that the respondents' former clients (several thousand in number) were aware of the status of their cases and their right to counsel, and to protect them against the possibility of the running of the statute of limitations on their claims. The court sought to prevent speedy and inadequate settlements of these claims by respondents that would be detrimental to the clients' interests unless the clients had received complete disclosure of respondents' status.

For these reasons, this court finds that respondents' belated offer of compliance is unavailing. By the time respondents offered to comply with the order of June 12, 1985, the purpose of the order could no longer be fulfilled and compliance would not have remedied the harm the respondents' refusal had caused to the administration of justice.

This court has been informed, and exhibits filed herein establish, that the respondents sold the "assets" of their law practice to attorney Alan Katz for an amount exceeding $750,000, plus 50% of all fees generated by the client files transferred to Katz. During oral argument before this court in April 1986 and on January 23, 1987, the Administrator reported to this court that the respondents have received thousands of dollars of fees from the settlement of cases tranferred to Katz pursuant to the asset agreement. These statements stand undenied by the respondents. Thus, respondents have continued to receive fees in connection with the same clients with whom this court's order of June 12, 1985, directed the respondents to communicate.

At the same time, they refused on fifth amendment grounds to comply with the order of this court to disclose the names of these clients and to communicate with them.

Because the petitioners maintain that the Illinois Supreme Court's imposition of criminal-contempt sanctions improperly penalized the petitioners for invoking their privilege against self-incrimination, they petition this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The court now turns to the merits of the petition.

## II

### Analysis

The sanctity of the fifth amendment[7] has been proclaimed so often that the court need not do it again here. But in light of the nature of this case, a brief review of the values underlying the privilege of self-incrimination is appropriate. The privilege is founded in part on a societal "preference for an accusatorial rather than an inquisatorial system of justice" and reflects "our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt." *Murphy v. Waterfront Comm'n of New York Harbor,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964). The privilege further protects the privacy of the individual and embodies respect for the human personality. *Ibid.* While courts can find the assertion of the privilege inappropriate in certain circumstances, such as where the court has granted immunity or found the privilege to be waived, courts are not free to reject invocations of the fifth amendment in a manner which endangers the values upon which the privilege is based. *See, e.g., Spevack v. Klein,* 385 U.S. 511, 514, 87 S.Ct. 625, 627, 17 L.Ed.2d 574 (1967) (a

lawyer in a disciplinary proceeding cannot be penalized by being disbarred for asserting the privilege); *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1494, 12 L.Ed.2d 653 (1964) (a person shall "suffer no penalty" for invoking the privilege). Unless the procedure a court uses for resolving fifth amendment claims shields the claimant from the horns of the "cruel trilemma," that procedure might chill the exercise of the privilege and hence deserves close scrutiny.

For purposes of resolving the constitutional issue raised by the petitioners, the court can strip its own lengthy recitation of facts to its bare essentials. The Illinois Supreme Court ordered the petitioners to draft a revised letter, mail that letter to their former clients and produce or create a list of all pending cases the petitioners had been associated with. The petitioners respectfully refused to do so in part on the basis of their privilege against self-incrimination. Instead of ruling on the merits of the petitioners' invocation of the privilege, the Court instituted contempt proceedings against the petitioners. The petitioners in those proceedings continued to invoke the privilege and pleaded the Court for a resolution of the merits of their invocation before the Court reached for its contempt power.[8] The Court, implicitly rejecting that request, simultaneously rejected the petitioners' fifth amendment objection and found them in contempt.

■ The procedure used by the Illinois Supreme Court deprived the petitioners of due process in violation of the fourteenth amendment because, in essence, the procedure punished the petitioners' invocation of their privilege against self-incrimination. In this court's view, due process required that the Illinois Supreme Court rule on the petitioners' fifth amendment claim and

7. In *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), the Supreme Court held that the privilege of the fifth amendment was made applicable to the states by the fourteenth amendment. *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964).

8. The respondents argument that the petitioners did not assert before the Illinois Supreme Court the constitutional argument which they assert

now cannot be taken seriously. The relevant transcripts are replete with references to the petitioners' belief that the Court had to resolve the fifth amendment question before invoking its contempt power. Tr. (August 13, 1985) at 68; Tr. (April 18, 1986) at 39–41. Despite respondents' claim to the contrary, the petitioners did not waive that argument at the sentencing hearing.

then order compliance with the Court's June 12, 1985 Order before the Court invoked its contempt power. If the law were otherwise, a person with a meritorious fifth amendment objection might not assert the privilege at all simply because of fear that the judge would find the invocation erroneous and hold the person in contempt. In that scenario, the law would throw the person back on the horns of the "cruel trilemma" for in order to insure against the contempt sanction the person would have to either lie or incriminate himself. Because such a procedure directly endangers the values upon which the privilege is based this court rejects the procedure, a ruling consistent with rulings by both the Second and D.C. Circuits. *Traub v. United States*, 232 F.2d 43, 49 (D.C.Cir.1955) ("no contempt can lie unless the refusal to answer follows an adverse ruling by the court on the claim of the privilege or clear direction thereafter to answer" (citation omitted)); *Carlson v. United States*, 209 F.2d 209, 214 (1st Cir.1954) ("the claim of privilege calls upon the judge to make a ruling whether the privilege was available in the circumstances presented; and if the judge thinks not, then he instructs the witness to answer"). *See also Wolfe v. Coleman*, 681 F.2d 1302, 1308 (11th Cir.1982) (the petition for the writ in a contempt case failed because the court had found the petitioner's first amendment objection invalid before ordering him to answer); *In re Investigation Before the April 1975 Grand Jury*, 531 F.2d 600, 608 (D.C.Cir.1976) (a witness is subject to contempt if the witness refuses to answer a grand jury question previously found not to implicate the privilege). *Compare Maness v. Meyers*, 419 U.S. 449, 459, 95 S.Ct. 584, 591, 42 L.Ed.2d 574 (1975) ("*once the court has ruled*, counsel and others involved in the action must abide by the ruling and comply with the court's orders" (emphasis added)); *United States v. Ryan*, 402 U.S. 530, 533, 91 S.Ct. 1580, 1582, 29 L.Ed.2d 85 (1971) (after the court rejects a witness' objec-

tions, the witness is confronted with the decision to comply or be held in contempt if his objections to testifying are rejected again on appeal).

Although the Supreme Court has yet to address this issue directly, the Court has come awfully close. The Supreme Court in *Quinn v. United States*, 349 U.S. 155, 75 S.Ct. 688, 99 L.Ed. 964 (1955) held that in congressional-committee hearings the committee must clearly dispose of the witness' fifth amendment claim and order that witness to answer before the committee invokes its contempt power. *Quinn v. United States*, 349 U.S. 155, 167–68, 75 S.Ct. 668, 675–76, 99 L.Ed. 964 (1955). According to *Quinn*, "unless the witness is clearly apprised that the committee demands his answer notwithstanding his objections," the witness' refusal to answer is not contumacious because the requisite intent element of the congressional-contempt statute is lacking. *Id.* at 165–66, 75 S.Ct. at 674–75 (discussing 2 U.S.C. § 192). The court further stated that "a clear disposition of the witness' objection is a prerequisite to prosecution for contempt." *Id.* at 167, 75 S.Ct. at 675. In *Slagle v. Ohio*, 366 U.S. 259, 81 S.Ct. 1076, 6 L.Ed.2d 277 (1961), the court extended *Quinn* to the state legislative setting. *Slagle v. Ohio*, 366 U.S. 259, 267, 81 S.Ct. 1076, 1080, 6 L.Ed.2d 277 (1961). In so doing, however, the court did not focus on the elements of the state contempt-statute. Instead, the court held that the legislative committee's failure to dispose of the witness' fifth amendment objection before holding the witness in contempt was *unconstitutional* because that failure deprived the witness of due process in violation of the fourteenth amendment. *Ibid.* The court thus made clear that its analysis did not turn on the fine points of the relevant contempt statute but rather on its view of what procedure is mandated by the Constitution.[9]

---

9. Even if the Court's ruling did turn on the fine points of the statute, in Illinois direct criminal contempt of court has an intent element. *People v. Siegel*, 94 Ill.2d 167, 68 Ill.Dec. 118, 120, 445 N.E.2d 762, 764 (1983). As in *Quinn*, the

Illinois Supreme Court could not infer an intent to obstruct or hinder the administration of justice until it ruled on the petitioners' objection. *See Quinn*, 349 U.S. at 165–66, 75 S.Ct. at 674–75.

Nothing in the record before this court indicates that the petitioners' assertion of their fifth amendment privilege was in bad faith.[10] But even if this court assumed that the petitioners had exercised the privilege in bad faith, the Illinois Supreme Court did not hold the petitioners in direct criminal contempt for a bad-faith invocation of the privilege; instead, the Court held the petitioners in contempt for refusing to comply with the June 12, 1985 Order. As a result, nothing in this court's ruling today will lead to a massive increase in bad-faith invocations of the privilege, for those acts themselves may be worthy of the contempt sanction. *Cf. Maness*, 419 U.S. at 470 n. 19, 95 S.Ct. at 597 n. 19 (the Court hinted that invoking the privilege in bad faith may subject one to the contempt power). If the Illinois Supreme Court had found bad faith, the fair procedure would still have included formal rejection of the fifth amendment claim *then* an order to comply with the June 12, 1985 Order. The same holds true if the Court considered the petitioners' assertion to be "frivolous"—an explicit rejection followed by an order to comply constitutionally would have sufficed before imposing the contempt sanction.[11]

The validity of the petitioners' position is demonstrated by the respondents' weak retort. In support of their argument that the Constitution does not require an explicit ruling before a finding of contempt can be made, the respondents cite only *Barr v. Abrams*, 641 F.Supp. 547 (S.D.N.Y.1986). That case involved the propriety of a civil rights suit for damages against public officials who initiated criminal-contempt charges against the plaintiff for refusing to comply with a court production order based on the privilege against self-incrimination. The *Barr* court discussed only the question of whether those officials were immune from suit under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and made no statement as to whether the Constitution requires an explicit judicial determination concerning the availability of the privilege before the imposition of criminal-contempt sanctions. *Barr v. Abrams*, 641 F.Supp. 547, 552 (S.D. N.Y.1986).

### Conclusion

For the reasons given,[12] the court finds that the petitioners are in custody[13] because of a judgment of the Illinois Supreme Court in violation of the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States. Consequently, the court issues the writ of habeas corpus.

---

**10.** The petitioners' good faith is best supported by Judge Brodkin's ruling that their invocation of the privilege was proper. The good-faith nature of the assertion is further exemplified by the petitioners' proposal to the Illinois Supreme Court that they be granted use immunity in return for compliance. Tr. (April 18, 1986) at 26–27, 30–31. The Court never commented on the proposal.

**11.** Although this court never reached the merits of the petitioners' invocation of the fifth amendment, given the time the Illinois Supreme Court devoted to the question at the hearings and required to rule on the merits it is unlikely the Court considered the invocation frivolous. Moreover, the eighteen-month lag between the June 12, 1985 Order and the Court's final ruling was not attributable to delay on the petitioners' part. The petitioners' invoked the privilege twenty-six days after the Court issued the June 12, 1985 Order, not an unreasonable time period in light of the circumstances.

**12.** This court expresses no view on the arguments raised by the petitioners not expressly addressed in this opinion.

**13.** For purposes of 28 U.S.C. § 2254(a), the petitioners who are free on their own recognizance but subject to certain restraints are considered to be in "custody." *See Hensley v. Municipal Court, San Jose–Milpitas Judicial Dist., Santa Clara County*, 411 U.S. 345, 353, 93 S.Ct. 1571, 1576, 36 L.Ed.2d 294 (1973).